United States v. Lombardozzi

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term, 2004

(Argued: November 30, 2004                                        Decided: July 11, 2007 )

Docket No. 04-0380-cr

_____

UNITED STATES OF AMERICA,
                              *Appellee,*

*− v. −*

GEORGE LOMBARDOZZI,
                              *Defendant-Appellant.*

_____

BEFORE:                    KEARSE, SACK, and HALL, *Circuit Judges*.

_____

Appeal from a judgment of conviction for conspiring to make and making an extortionate extension of credit in violation of 18 U.S.C. § 892 and conspiring to use extortionate means to collect an extension of credit in violation of 18 U.S.C. § 894 in the United States District Court for the Southern District of New York (Leisure, *J.*).  Under then existing precedent, the district court admitted a plea allocution which, following *Crawford v. Washington*, 541 U.S. 36 (2004), we must now hold to be a violation of Appellant's Sixth Amendment Confrontation Clause rights.  Because the error was harmless and evidence sufficient, we affirm.

_____

ALAN S. FUTERFAS, New York, New York, *for Appellant.*

ADAM B. SIEGEL, Assistant United States Attorney, (David N. Kelley,
        United States Attorney for the Southern District of New York,

DIANE GUJARATI, Assistant United States Attorney, *on the brief*), New York, New York, *for Appellee*.

_____

HALL, *Circuit Judge*:

Appellant George Lombardozzi was charged in four counts of a 19-count indictment. Count 7 charged him with conspiring to make an extortionate extension of credit in violation of 18 U.S.C. § 892; Count 8 charged him with the substantive offense of making an extortionate extension of credit in violation of 18 U.S.C. § 892; Count 9 charged him with conspiring to use extortionate means to collect on an extension of credit in violation of 18 U.S.C. § 894; and Count 10 charged him with using extortionate means to collect on an extension of credit in violation of 18 U.S.C. § 894. The four charges all stemmed from loans amounting to approximately $100,000 that Lombardozzi made in 1998 and 1999. A jury convicted Lombardozzi of three of the four charged offenses. They acquitted him of Count 10, the substantive offense of using extortionate means to collect on an extension of credit. His conviction was based in part on evidence presented in the form of a co-defendant's plea allocution. Following the trial, the United States Supreme Court decided *Crawford v. Washington*, 541 U.S. 36 (2004), holding that in order for testimonial evidence such as a plea allocution to be admissible against a criminal defendant, the Sixth Amendment Confrontation Clause requires the unavailability of the witness and a prior opportunity for cross-examination of the witness by the defendant. *Id.* at 68.

Lombardozzi raises a number of challenges to his conviction. He argues that the evidence presented at trial was insufficient to support his conviction; that the admission of his co-conspirator's plea allocution violated his Sixth Amendment Confrontation Clause rights; that

2

the district court improperly admitted expert testimony and evidence of prior bad acts; and that the government presented perjured testimony to the grand jury.

For the reasons set forth below, the judgment of the district court (Leisure, *J.*) is affirmed.

**Background**

Lombardozzi, an alleged member of the Gambino La Cosa Nostra Crime Family, first met Henry Leung in 1994 at a restaurant that Leung managed in Manhattan. Leung was planning to open a new restaurant and needed a loan to be able to do so. One of Leung's frequent customers was Daniel Marino, whom Leung knew was engaged in racketeering and loansharking or, as Leung described him, a "wiseguy . . . . involved with the mob." Leung asked Marino for a $50,000 loan. In response, Marino introduced Leung to Lombardozzi who agreed to provide him with the loan. Leung was told that Lombardozzi was the guy who "takes care of the money." Frank Isoldi, another member of "Marino's group" and Lombardozzi's co-defendant, subsequently met Leung in the restaurant's wine cellar and gave him a brown paper bag containing $50,000 in cash. Thereafter, Leung made repayments to William Scotto, whom he described as the "muscle" for the group. The loan was eventually paid off and is not the subject of the current indictment.

In 1998, Leung sought an additional $20,000 loan from Marino's group. Because Marino was incarcerated, Lombardozzi and Isoldi agreed to loan Leung the money. Again, in the wine cellar of Leung's restaurant, Isoldi delivered to Leung a paper bag containing the money. The terms of the loan originally required repayment in the amount of $1,500 per month for two years, but Scotto subsequently informed Leung that "the old man"—whom Leung understood to mean

3

Lombardozzi—had changed the terms and increased the payments to $2,500 per month for two years.

Shortly thereafter, Leung again borrowed money from Lombardozzi and Isoldi, this time for both himself and his friend Michael Wong. He originally asked for $25,000 ($20,000 for Wong and $5,000 for himself), but the principal amount of the loan eventually ballooned to $100,000. Leung was required to pay two points, or two percent, interest each week (104% per year), which amounted to $2,000 per week in interest in addition to the $100,000 principal.

Given the exorbitant payments required, Leung had to borrow money from other loansharks just to pay his debt to Lombardozzi in a timely manner. The interest on the additional loans was 250%—more than twice what he was paying Lombardozzi. In addition, Leung sold many of his personal possessions, moved to a less expensive residence, and borrowed money from friends. Eventually, Leung was able to renegotiate the terms of the loans with the other loansharks, although he never sought to do so with Lombardozzi.

The FBI approached Leung in early 2001 seeking information about his dealings with Lombardozzi, but Leung denied knowing him. Leung told Isoldi and Scotto about the FBI's inquiry, and they gave him the phone number of a lawyer. Despite the inquiry, the collections continued until Lombardozzi was arrested in May 2002.

In September 2002, Isoldi pleaded guilty to Count 9 of the indictment, under which he was charged as a co-defendant of Lombardozzi with conspiring to use extortionate means to collect on the extension of credit made to Leung. In connection with his Rule 11 guilty plea proceedings, in response to Judge Leisure's questioning, Isoldi allocuted to the relevant facts underlying that charge. Then, prior to the commencement of Lombardozzi's trial in April 2003,

4

the district court granted a motion *in limine* allowing the government to introduce a redacted version of Isoldi's plea allocution as evidence against Lombardozzi. Judge Leisure instructed the jury that it was to consider the redacted plea allocution only as evidence of the existence of the conspiracy charged in Count 9 of the indictment and the nature of Isoldi's role in that conspiracy. Following a nine-day trial, in which the government's evidence against Lombardozzi consisted of, inter alia, Isoldi's plea allocution, intercepted telephone calls, Leung's testimony, and expert testimony, the jury convicted Lombardozzi on Counts 7, 8, and 9. It acquitted him of the substantive offense of using extortionate means to collect on an extension of credit (Count 10). The district court sentenced Lombardozzi principally to 41 months' imprisonment, the lowest sentence possible within the applicable Sentencing Guidelines range.

**Discussion**

## 1. The Government Presented Sufficient Evidence at Trial

### A. Standard of Review

Lombardozzi challenges the sufficiency of the government's evidence with respect to two elements of the crimes for which he was convicted. The first is the victim Leung's understanding that the loans he received were extortionate, an essential element for conviction under § 892. The second is Lombardozzi's own state of mind with respect to the extortionate nature of the loans and their collection, an essential element for conviction under both §§ 892 and 894.

"As we have repeatedly observed, a defendant raising an appellate challenge to the sufficiency of the evidence supporting a conviction faces a 'heavy burden,' because we must review the evidence in the light most favorable to the government, drawing all reasonable inferences in its favor." *United States v. Gaskin*, 364 F.3d 438, 459 (2d Cir. 2004). This

5

deferential standard "is especially important when reviewing a conviction of conspiracy. . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case 'where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir. 1992) (quoting *United States v. Provenzano*, 615 F.2d 37, 45 (2d Cir. 1980)). "Reversal is warranted only if no rational factfinder could have found the crimes charged proved beyond a reasonable doubt." *Gaskin,* 364 F.3d at 459-60.

### B.  Statutes Under Which Lombardozzi Was Convicted

Lombardozzi was convicted of conspiring to make and making extortionate extensions of credit in violation of 18 U.S.C. § 892 and conspiring to use extortionate means to collect on an extension of credit in violation of 18 U.S.C. § 894.  Section 892(a) prohibits "mak[ing] any extortionate extension of credit, or conspir[ing] to do so."  An "extortionate extension of credit" is defined as "any extension of credit with respect to which it is the *understanding of the creditor and the debtor at the time it is made* that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation, or property of any person." 18 U.S.C. § 891(6) (emphasis added).  The states of mind of the defendant and the debtor are, therefore, both essential elements of the crime of making extortionate extensions of credit under § 892.[1]  *See United States v. Allen*, 127 F.3d 260,

---

[1]  This Circuit has not yet ruled on whether a debtor's state of mind is an element of conspiracy under 18 U.S.C. § 892.  Other Circuits that have addressed the issue have held that the debtor's state of mind is irrelevant.  *See*, *e.g.*, *United States v. Nakaladski*, 481 F.2d 289, 297 (5th Cir. 1973) ("In order to convict appellants of conspiring to make an extortionate extension of credit, it [is] necessary for the government to prove only that appellants had planned and intended that [the debtor] would understand the possibility that harmful consequences could be attendant upon his default or delinquency."); *United States v. Annoreno*, 460 F.2d 1303, 1309 n.7 (7th Cir. 1972) (noting that because the defendants were charged under § 892 with conspiring to make extortionate loans, not with the substantive violations, "the actual understanding of specific

6

266 (2d Cir. 1997) ("Crucial to conviction under this statute is proof that both the creditor and the debtor understood when the loan was made that force could be used to collect the loan at issue."); *United States v. Natale*, 526 F.2d 1160, 1168 n.10 (2d Cir. 1975) (noting that unlike 18 U.S.C. § 894, "the state of mind of the victim [is] an essential element of [§ 892] to be proved by the Government"). Section 892(b) further provides that the government can establish prima facie evidence that a loan was extortionate if it can show: (1) the repayment of the loan would be unenforceable through civil judicial process against the debtor, (2) the loan had an annual interest rate in excess of 45 percent, and (3) "[a]t the time the extension of credit was made, the debtor reasonably believed that . . . the creditor had a reputation for the use of extortionate means to collect extensions of credit or to punish the nonrepayment thereof." 18 U.S.C. § 892(b).

Similarly, 18 U.S.C. § 894(a) prohibits "knowingly participat[ing] in any way, or conspir[ing] to do so, in the use of any extortionate means (1) to collect or attempt to collect any extension of credit, or (2) to punish any person for the nonrepayment thereof." "[E]xtortionate means" is defined as "any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person." 18 U.S.C. § 891(7). Unlike § 892, proof of a victim borrower's state of mind is not an element of this offense, *see Natale*, 526 F.2d at 1168 (noting that "it is the conduct of the defendant, not the victim's individual state of mind, to which the thrust of [§ 894] is directed").

---

borrowers was not an element of the conspiracy with which defendants were charged. The government need only have proved that the defendants planned and intended that those to whom they extended credit would understand the possible harmful consequences of default or delinquency"). Here, the district court instructed the jury that the victim's state of mind was relevant, and the jury nonetheless convicted Lombardozzi under this heightened standard. Because it is clear that under either standard the evidence here is sufficient to support Lombardozzi's conspiracy conviction under § 892, we need not reach the issue.

7

With regard to the defendant's state of mind, the government must prove that he intended by his conduct to instill fear of harm in the victim borrower. *See United States v. Sears*, 544 F.2d 585, 588 (2d Cir. 1976).

### C. Whether the Evidence Was Sufficient to Prove Leung's State of Mind

Lombardozzi argues that the government's evidence was insufficient to prove Leung's requisite state of mind. We disagree. "[T]he inquiry [into the victim borrower's state of mind] should be whether the record as a whole discloses a reasonable basis upon which the borrower[] might have predicated [his] fear that default or delinquency might result in harm to [himself] or [his] famil[y]." *Annoreno*, 460 F.2d at 1309. A finding that the record discloses such a reasonable basis does not necessarily depend on evidence of explicit threats made by the creditor, and the victim borrower's requisite state of mind can be inferred. *See, e.g., id.* ("Our review of the record compels the conclusion that the nature of these transactions, in which oral, unsecured loans were made at rates of interest often 30 times the commercial rates with provision for nefarious repayment at such places as street corners, taverns, pool halls and closed barber shops, would inform the average borrower . . . that the loans were extortionate in nature."). In our analysis, the component of our standard of review that requires us to draw all reasonable inferences in the government's favor is significant because even though Leung did not testify as to any specific threats or discuss his state of mind in detail, his state of mind can be inferred from the evidence offered at trial.

First, the jury could infer from several portions of Leung's trial testimony his understanding that violence or criminal harm would result if he defaulted on his loans. Leung testified that he was introduced to Lombardozzi through Marino, someone he knew was a

8

"wiseguy . . . . involved with the mob," who engaged in racketeering and loansharking. *See United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005) (upholding the admission of evidence that the debtor believed the creditor was "connected to organized crime . . . to show the debtor's belief that the [creditor] would use, or had a reputation for using, extortionate means to collect extensions of credit" (citing *United States v. Gigante*, 729 F.2d 78, 83 (2d Cir. 1984))). Regarding the loans he took out on behalf of his friend Wong, Leung testified that he sought money from other sources in order to repay the loans "[b]ecause when the time come[s], the day to collect, I have got to have the money ready, because they are not going after [Wong], they are going after me." With regard to making payments in general, moreover, Leung testified that he was "very nervous . . . because every morning when I wake up, it's this money, that money. And I have a business, I cannot run away, and I don't want anything to happen to the business." In describing a telephone conversation with Isoldi about making payments, Leung explained that in telling Isoldi "[i]f you can help me with that, I would be deeply appreciat[ive]," he meant that he wanted Isoldi to hold off Lombardozzi. Indeed, he testified that "I just don't want them to do anything, you know—you know, I'm a little scared, so that's why I'm just telling him to hold off, hold off [Lombardozzi]." Finally, on cross examination, Leung testified that when he was having trouble making payments, Lombardozzi told him that he had "better take care of it." Although this statement does not necessarily rise to the level of an explicit threat, it at least permits the inference of an implied threat from which Leung's fear of harm can be reasonably inferred. *See Madori*, 419 F.3d at 169 (upholding the admission of evidence of veiled threats to prove the victim borrower's state of mind) (citing *Gigante*, 729 F.2d at 83).

9

Leung's understanding that extortionate means would be used to collect on any default can also reasonably be inferred from his testimony regarding the terms of the loan, i.e., 104% interest, the delivery of the money in a paper bag in Leung's wine cellar, and his statement to FBI Agent Christopher Bryceland that Isoldi acted as a "runner" for Lombardozzi (giving Leung the actual cash and collecting payments on Lombardozzi's behalf). *See Annoreno*, 460 F.2d at 1309. Leung also testified that he sold his assets, sought loans from friends, and borrowed money from other loansharks at interest rates of more than 250% in order to repay his loan to Lombardozzi on time, all evidence from which the jury could permissibly infer that Leung feared the consequences of non-payment.

Finally, the testimony of Agent Bryceland and tape-recorded conversations between Isoldi and Leung constitute additional evidence from which the jury could infer Leung's understanding that delays in making payments could result in violence or other criminal harm. Specifically, Agent Bryceland testified that Leung told him that Leung believed Lombardozzi was involved with organized crime and that he would be dead if he talked to the FBI. Leung also informed Agent Bryceland that he was concerned for his safety and that Isoldi and another associate "have muscle and . . . would do harm to him personally or to his restaurant if he did not make timely payments." In a telling exchange with Agent Bryceland, Leung initially denied knowing either Lombardozzi or Isoldi and lied about the loans, likely out of fear for his own safety, and from the taped conversations in evidence, the jury could infer that Leung was scared and nervous. *See,*

10

*e.g.*, *United States v. Wills*, 346 F.3d 476, 499 (4th Cir. 2003) (noting that it is reasonable for a jury to conclude, based on recorded conversations, that the victim was in fear).[2]

Based on the foregoing proof and reasonable inferences that could be drawn from it, the evidence was sufficient for the jury to conclude that Leung understood that delay or default in making repayment could result in violence or other criminal harm.

### D. *Whether the Evidence Was Sufficient to Prove Lombardozzi's State of Mind*

With respect to Lombardozzi's state of mind, under § 892 the government had to prove that at the time Lombardozzi caused the loan to be made to Leung, Lombardozzi had an understanding that if Leung delayed in making, or failed to make, repayment, Leung could be harmed. Under § 894 the focus is on the defendant's actions and intentions with respect to the collection activity. The government had to establish that, in collecting the loans, Lombardozzi intended, as the result of his actions, to cause Leung to fear he would suffer harm to his person, reputation, or property. Lombardozzi argues that the government did not provide evidence sufficient to prove that he had the required state of mind. We disagree.

Lombardozzi's state of mind, much like Leung's, can reasonably be inferred from the terms of the loans that he extended. Indeed, a jury may permissibly infer that someone who makes an unsecured loan and charges exorbitant interest rates surely intends to back up the loan

---

[2] In weighing Leung's testimony, a jury could reasonably infer that because Leung feared retribution, he minimized the extent of his fear when he testified. *See United States v. DeLutro*, 435 F.2d 255, 257 (2d Cir. 1970) (approving such an inference and noting that a jury is free to use common sense); *see also United States v. Chen*, 378 F.3d 151, 162 (2d Cir. 2004) (noting that the jury is free to disbelieve a witness's denials); *but see United States v. Zimmitti*, 850 F.2d 869, 876 (2d Cir. 1988) (noting that "[t]he government [is] not entitled to prove that the defendants made threats to [the victim] simply by putting [the victim] on the stand, allowing him to indicate that no threats were made, and asking the jury to disbelieve that testimony").

11

with threats of violence. *See United States v. Polizzi*, 801 F.2d 1543, 1555 (9th Cir. 1986) ("The jury could reasonably have concluded that [the] evidence proved that [defendant] knew [the victim] was paying an extortionate rate of interest on his debt and that [defendant] must therefore have known that the debt could have been secured only by threats of violence or harm to [the victim]."). Given the context of an unsecured loan at an exorbitant interest rate, a jury could also infer from Lombardozzi's own statements his intent to back up the loan with threats of violence. For instance, he told Leung to "keep up what [he was] doing" when Leung made payments, which Leung understood to mean "make the payments on time, be a good boy." Further, when Leung started having trouble making payments, Lombardozzi told him that he had "better take care of it." It is reasonable for a jury to infer that these statements were threatening in nature, if not direct threats themselves. In addition, those statements permitted the inference that Lombardozzi not only understood the extortionate nature of the loan, which is the state of mind required under § 892, but that he intended to instill fear in Leung, which is the state of mind required under § 894. While those statements were not made contemporaneously with the making of the loans, they nonetheless did provide evidence as to Lombardozzi's state of mind regarding their repayment. *See United States v. Lamattina*, 889 F.2d 1191, 1193 (1st Cir. 1989) ("Although these threats were made after the time of the loans, they may still shed light on appellant's intentions when he made the loans. Surely, this evidence is more than sufficient to reasonably infer the requisite 'understanding.'").

Taped conversations between Leung and Isoldi also shed light on Lombardozzi's state of mind. The jury was entitled to infer from those conversations that Leung was afraid; that Isoldi, as a coconspirator, was speaking for Lombardozzi; and that instilling such fear was

12

Lombardozzi's intent. For example, in one such conversation, occurring at a time when Leung was having trouble making payments, Isoldi told him "I think I'm going to have to make an appointment for you to see [Lombardozzi] in person, because it's going to get out of hand." Isoldi also threatened to bring Lombardozzi to the restaurant if Leung did not make his payments. Peter Perrotta, Isoldi's associate, corroborated the details of the conversations. Perrotta testified that "[Isoldi] seemed very animated that [Leung] wasn't ready to see [Lombardozzi], and basically said that [Lombardozzi] wasn't going to be happy, and that he doesn't want to have to send [Scotto]." From this evidence, a jury could reasonably infer that Lombardozzi intended to harm Leung if he did not pay, or at the very least that he intended Leung to fear harm, particularly considering the suggestion of sending Scotto—the group's "muscle"—to see him.

*E. Conclusion*

For the reasons stated, there is sufficient evidence from which the jury could find that the government proved the requisite states of mind for Leung and Lombardozzi so as to sustain Lombardozzi's convictions under 18 U.S.C. §§ 892 and 894.

## 2. The Admission of Kenneth McCabe's Expert Testimony was not Plain Error

*A. The Expert Testimony of Kenneth McCabe*

The government called Kenneth McCabe, a criminal investigator for the United States Attorney's office for the Southern District of New York, as an expert who testified as to, inter alia, the general structure of La Cosa Nostra in New York and Lombardozzi's affiliation with organized crime. On direct examination McCabe was asked whether he had an opinion as to whether Lombardozzi is affiliated with organized crime. McCabe answered, "Yes. George Lombardozzi is a soldier in the Gambino crime family." Earlier in his testimony, in describing

13

the general structure of organized crime, McCabe stated that "soldiers" are also known as "made" members. On cross-examination McCabe testified that his opinion regarding Lombardozzi's affiliation with organized crime was based on conversations with cooperating witnesses and confidential informants, but added that he personally observed Lombardozzi's activities approximately two dozen times since 1985. McCabe testified that during his surveillance he witnessed Lombardozzi having conversations with known organized crime figures and frequenting social clubs which McCabe identified as "meeting place[s] for organized crime members to socialize and commit planned crimes, collect monies." Lombardozzi failed to object to the admission of McCabe's testimony on Confrontation Clause grounds at trial.

Lombardozzi now argues on appeal that the admission of McCabe's expert testimony was improper under, inter alia,[3] the Confrontation Clause of the Sixth Amendment because McCabe's opinion, in effect, directly conveyed to the jury out-of-court testimonial statements of confidential informants and cooperating witnesses whom Lombardozzi never had an opportunity to cross-examine. In *Crawford*, the Supreme Court stated that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." 541 U.S. 36, 60 n.9. In light of that statement in *Crawford* and this Court's previous determination that it is permissible for an expert witness to form an opinion by applying her expertise to otherwise inadmissible evidence because, in that limited instance, the evidence is not being presented for the truth of the matter asserted, *see United States v. Dukagjini,* 326 F.3d 45, 57-58 (2d Cir. 2003), the admission of McCabe's testimony was error only if he

---

[3] Lombardozzi's other objection to the admission of McCabe's expert testimony is addressed in this opinion in section 4.A., *infra*.

14

communicated out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of an expert opinion. While the record indicates that may have been the case, and admission of McCabe's testimony, therefore, may have constituted error, we hold it did not rise to the level of reversible plain error because it did not affect Lombardozzi's substantial rights.

### B. Standard of Review

Because Lombardozzi failed to preserve the issue, we review the admission of McCabe's testimony under a plain error standard. *See United States v. Banks,* 464 F.3d 184, 189 (2d Cir. 2006). That standard is not met unless there is, inter alia, "(1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.'" *Johnson v. United States,* 520 U.S. 461, 466-67 (1997) (quoting *United States v. Olano,* 507 U.S. 725, 732 (1993)). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Johnson,* 520 U.S. at 467 (internal quotations marks omitted). "[R]eversal for plain error should 'be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" *Banks,* 464 F.3d at 189 (quoting *United States v. Frady,* 456 U.S. 152, 163 n.14 (1982)).

### C. Analysis

#### i. Whether the error was "plain"

For an error to be "plain" it must be "clear" or "obvious," *Olano,* 507 U.S. at 734, "at the time of appellate consideration." *Johnson,* 520 U.S. at 468. In fact, the error must be "'so egregious and obvious as to make the trial judge and prosecutor derelict in permitting it, despite

15

the defendant's failure to object.'" *United States v. Feliciano*, 223 F.3d 102, 115 (2d Cir. 2000) (quoting *United States v. Gore,* 154 F.3d 34, 43 (2d Cir.1998)). As stated above, based on *Crawford,* 541 U.S. at 59 n.9 (stating the Confrontation Clause bars only those out-of-court testimonial statements offered for the truth of the matter asserted), and this Court's decision in *Dukagjini*, McCabe's reliance on out-of-court testimonial statements in forming his opinion that Lombardozzi is affiliated with organized crime may only have been permissible if McCabe applied his expertise to those statements but did not directly convey the substance of the statements to the jury. *See Dukagjini,* 326 F.3d at 59 (stating that *United States v. Locascio,* 6 F.3d 924 (2d Cir. 1993), "permits an expert to rely on hearsay evidence for the purposes of rendering an opinion based on his expertise" but adding that an expert may not simply repeat "hearsay evidence without applying any expertise whatsoever" because it enables the government to put before the jury an "out-of-court declaration of another, not subject to cross-examination . . . for the truth of the matter asserted"). In *Dukagjini*, we found expert testimony to have been erroneously admitted even though the expert testified that his opinion was based on his own knowledge of the investigation as well as out-of-court statements made by "cooperating individuals," because his opinion, at least in part, seemed to convey out-of-court statements to the jury directly. *Id.* We held, however, the conclusion that the expert's testimony actually conveyed out-of-court statements to the jury "require[d] an inference that was not so obvious as to be correctable as plain error." *Id.* at 61.

Similarly here, McCabe suggests that he relied on a variety of sources in forming his opinion as to Lombardozzi's affiliation with organized crime. While the out-of-court statements made by cooperating witnesses and relied upon by McCabe were almost certainly testimonial,

and the confidential informants' statements also may have been testimonial, the content of those statements was never revealed to the jury, and there is no indication of the extent to which McCabe relied on them. It is clear, however, that McCabe's opinion as to Lombardozzi's affiliation was fully supported by evidence that can in no way be considered testimonial, specifically, McCabe's personal surveillance of Lombardozzi. A conclusion, therefore, that in opining that Lombardozzi was affiliated with organized crime McCabe was directly conveying to the jury out-of-court testimonial statements—rather than merely applying his expertise to those statements—requires an inference not obvious or egregious enough to be correctable as plain error. *See Dukagjini*, 326 F.3d at 61; *cf. United States v. Stone,* 432 F.3d 651, 654 (6th Cir. 2005) (reviewing district court decision de novo, and finding no Confrontation Clause violation where defendants could not "point to any testimony by [the expert] that was not supported by prior in-court witness testimony or by documents properly admitted into evidence").

In addition to allowing McCabe to testify that Lombardozzi is affiliated with organized crime, however, the district court allowed McCabe to testify that Lombardozzi is a "soldier" in the Gambino crime family, ruling that that evidence was relevant to show that Leung's subjective beliefs about Lombardozzi's debt collection practices were reasonable. Although McCabe's opinion as to Lombardozzi's actual rank in the crime family appears to have been based not on his own observations but on the inadmissible hearsay statements of others, and hence to have been excludable, as we explain below, we conclude that neither the admission of that part of his testimony, nor his testimony that Lombardozzi is affiliated with organized crime, affected Lombardozzi's substantial rights.

17

*ii. The error did not affect Defendant's substantial rights*

"[A]n error affects a defendant's substantial rights if it is prejudicial and it affected the outcome of the [case]." *Dukagjini*, 326 F.3d at 61 (internal quotation marks omitted). In addition, where "the effect of an error on the result in the district court is uncertain . . . indeterminate" or only speculative, we cannot conclude that appellant's substantial rights have been affected. *United States v. Williams,* 399 F.3d 450, 458 (2d Cir. 2005). Here, the government has shown that any effect on the outcome of the decision below is speculative at best.[4] McCabe did not offer an opinion as to an ultimate issue or even as to a critical issue in the case. *Cf. United States v. Forrester,* 60 F.3d 52, 64-65 (2d Cir. 1995) ("Error going to the 'heart' of a critical issue is less likely to be harmless."). He merely offered an opinion that Lombardozzi is affiliated with organized crime and a soldier in the Gambino crime family—facts that did not constitute an offense for which Lombardozzi stood trial. In fact, Judge Leisure properly instructed the jury that it need not believe the expert witness, and that Lombardozzi was not on trial for being a member of the Gambino crime family.

Lombardozzi's affiliation with organized crime could be inferred, moreover, from other properly admitted evidence including, inter alia, Leung's statement to an FBI agent that he believed Lombardozzi was connected to organized crime and Leung's direct testimony that Lombardozzi lent him money on behalf of a person Leung knew to be affiliated with organized

---

[4] When the source of plain error is a supervening decision, we have employed a modified plain error standard whereby the government bears the burden of proving that the error did not affect the defendant's substantial rights. We need not decide whether the Supreme Court's decision in *Johnson,* 520 U.S. 461, requires that we place the burden on the defendant in such cases because we find the error did not affect the defendant's substantial rights even under our more lenient standard. *See Banks*, 464 F.3d at 189 n.1.

18

crime. With respect to McCabe's testimony as to Lombardozzi's specific rank as "soldier," Leung's subjective beliefs about Lombardozzi's debt collection practices would have been reasonable even if Lombardozzi—known by Leung to be acting on behalf of Marino, a known organized crime figure—were merely affiliated with organized crime. Thus, the effect of the admission of McCabe's testimony on the outcome of the case can only be characterized as uncertain and speculative. *See Dukagjini,* 326 F.3d at 62 (holding that mere corroborative and cumulative evidence did not affect the jury's verdict and did not therefore affect the defendant's substantial rights).

In sum, the admission of McCabe's testimony did not cause the "miscarriage of justice" required under plain error analysis. *See Banks,* 464 F.3d at 190. Because any Confrontation Clause error resulting from the admission of McCabe's testimony did not affect Lombardozzi's substantial rights, we find it is not correctable as plain error and we need not consider whether Lombardozzi has met the requirements of the fourth prong of plain error analysis.[5] *Williams,* 399 F.3d at 458 ("Because this appellant has not carried his burden as to the third prong of the plain error test, we have no occasion to decide how he would have fared under the fourth prong.").

### 3. The Erroneous Admission of Isoldi's Plea Allocution was Harmless

#### A. The Plea Allocution and Limiting Instruction

The following portion of Isoldi's plea allocution was introduced against Lombardozzi as evidence tending to prove the existence of a conspiracy to use extortionate means to collect on an

---

[5] Lombardozzi argues alternatively that the district court's admission of McCabe's testimony was error because his testimony is based on inadmissible hearsay. Because Lombardozzi failed to object below, we review for plain error and hold, for the same reasons articulated in our disposition of Lombardozzi's Confrontation Clause argument, that the district court's admission of McCabe's testimony, if error, was not plain error because it did not affect Lombardozzi's substantial rights.

extension of credit in violation of § 894, charged in Count 9 of the indictment, and Isoldi's role in that conspiracy:

> Q: Now, let's turn to Count 9, which charges you with conspiracy to collect extensions of credit by extortionate means on debtor two. Tell me what you did.
> A: Again, your Honor, I conspired with others to collect a loan from Mr. Leung and, again, Mr. Leung interpreted my words as a sign of threat.
>
> . . . .
>
> Q: And as part of that agreement, did you do anything? What did you do?
> A: Basically, what I did was just call him and speak with him and ask him to pay his debt.
>
> Q: And did you use means that were calculated to create fear in him?
> A: Yes, I did.
>
> Q: Fear that there would be physical harm if he didn't pay, correct?
> A: Yes.
>
> Q: Let's make that clear, Mr. Isoldi. You agreed with one or more other persons to do what you described to this particular victim, correct?
> A: Correct, your Honor.
>
> Q: There was an agreement with others to do what you understand to be an unlawful act?
> A: Absolutely, your Honor.

Lombardozzi argues that this evidence constituted the only proof at trial that he had the requisite intent in conspiring to use extortionate means to ensure repayment of Leung's loans, and absent the plea allocution statements, the jury could not have found that he had that state of mind required under § 894. We disagree.

20

### B. Standard of Review

The government concedes that in light of the Supreme Court's decision in *Crawford*, the district court erred in admitting Isoldi's plea allocution, and that Lombardozzi properly preserved for appellate review the question of whether the plea allocution was admitted in violation of the Confrontation Clause. The district court's admission of the plea allocution is thus subject to harmless error review. *See United States v. McClain*, 377 F.3d 219, 222 (2d Cir. 2004) (noting that "[i]t is well established that violations of the Confrontation Clause, if preserved for appellate review, are subject to harmless error review . . . and *Crawford* does not suggest otherwise").

"[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986). Thus, in determining whether an error was harmless, we must, upon a review of the entire record, be satisfied "beyond a reasonable doubt that the error complained of"—in this case the introduction of Isoldi's plea allocution—"did not contribute to the verdict obtained." *McClain*, 377 F.3d at 222 (internal quotation marks omitted). In other words, to find the erroneous admission of Isoldi's plea allocution harmless "we must be able to conclude that the evidence would have been 'unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.'" *United States v. Quiroz*, 13 F.3d 505, 513 (2d Cir. 1993) (quoting *Yates v. Evatt,* 500 U.S. 391, 403 (1991)).

In assessing an error's likely impact on the jury, "the Supreme Court has found the following factors to be relevant . . . (1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the

wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted evidence." *Zappulla v. New York*, 391 F.3d 462, 468 (2d Cir. 2004). The strength of the prosecution's case, however, "is probably the single most critical factor." *United States v. Reifler*, 446 F.3d 65, 87 (2d Cir. 2006) (internal quotation marks omitted). In the past, this Court has generally found admissions of evidence in violation of *Crawford* to be harmless only where the remaining admissible evidence was "overwhelming." *See McClain*, 377 F.3d at 222.

### C. Analysis

"The essence of the [conspiracy] offense [under § 894] is that the conspirators entered into a scheme or plan to extort and committed an overt act in furtherance of that scheme or plan." *United States v. Rizzo*, 373 F. Supp. 204, 206 (S.D.N.Y. 1973). On summation, the government stated:

> There can be no doubt that a conspiracy existed because Frank Isoldi pled guilty to being a member of the conspiracy. He pled guilty to agreeing with others to use threats of physical harm to collect from Leung, so to suggest that Lombardozzi was not a member of the conspiracy is absurd, and to suggest that Lombardozzi did not know that extortionate means were going to be used is also absurd. It would cut against all the evidence which you heard.

Although the government asserted in its summation that Isoldi's plea allocution proves both that a conspiracy to extort existed and that Isoldi, as a member of the conspiracy, engaged in activity that meets the definition of extortionate means—two of the elements necessary to support Lombardozzi's conviction on Count 9—a review of the summation as a whole shows that the government placed little emphasis on Isoldi's plea allocution. *See Reifler*, 446 F.3d at 87. First, early in its summation, the government stressed to the jury that "Leung's testimony is all you need to convict the defendant on all four counts." Second, the transcript of the government's

22

summation reveals that mention of Isoldi's allocution comprises less than one page of an approximate fifty-page summation. *See*, *e.g.*, *Reifler*, 446 F.3d at 88 (mention of erroneously admitted plea allocution comprising one paragraph of a summation totaling more than 110 pages of transcript supports conclusion that admission of allocution was harmless). Finally, when the government did make reference to Isoldi's allocution, it also stated to the jury that Lombardozzi's membership in the conspiracy was supported by "all the evidence which you heard."

In that regard, the admissible evidence offered by the government to establish the conspiracy charged in Count 9 was overwhelming. At trial, Leung testified that he asked Marino for a loan; Marino introduced him to Lombardozzi; Lombardozzi agreed to provide Leung with the money; and Isoldi delivered to Leung that money, and other moneys subsequently borrowed from Lombardozzi. Leung also testified as to his understanding that Lombardozzi was approving the loans, that his loan payments were ultimately given to Lombardozzi, and that Lombardozzi mentioned the loans and Leung's repayment responsibilities every time he saw him. In addition, recorded conversations reveal, inter alia, Leung expressing concern, as a result of his failure to make timely loan payments, over getting "in trouble" with Billy Scotto—described by Leung as the "muscle" of the group—as well as being visited by Lombardozzi. Thus, Isoldi's plea allocution—allowed as evidence of the existence of an extortionate-collection conspiracy and Isoldi's role in that conspiracy—was entirely cumulative of the government's non-allocution evidence as to both the existence of the conspiracy and Isoldi's membership in it.

Because the government's properly admitted evidence as to Count 9 is "overwhelming," and the reference it made in summation to the allocution was limited, we hold the admission of

Isoldi's plea allocution was harmless error, and we affirm Lombardozzi's conviction on Count 9. *See*, *e.g.*, *Reifler*, 446 F.3d at 90 (admission of plea allocutions that bore on two essential elements of a conspiracy charge was harmless error given, inter alia, "the brevity of the government's mention of the plea allocutions, the purely cumulative character of the statements, and the strength of the government's case").

### 4. Other Issues

#### A. Bolstering

In addition to Lombardozzi's above-addressed arguments that the admission of McCabe's expert testimony was error, Lombardozzi argues that McCabe's testimony was improperly used to bolster the testimony of other fact witnesses. Noting that "[t]he decision whether to admit expert testimony under Fed. R. Evid. 702 is . . . left to the sound discretion of the trial judge and will not be set aside unless the ruling was manifestly erroneous," *United States v. Schwartz*, 924 F.2d 410, 425 (2d Cir. 1991) (internal quotation marks omitted), we hold that Lombardozzi's argument is without merit.

Expert testimony may not be used to bolster the credibility of fact witnesses. *See United States v. Cruz*, 981 F.2d 659, 662-63 (2d Cir. 1992) (citing *United States v. Castillo*, 924 F.2d 1227, 1231 (2d Cir. 1991)). It is well established, however, that expert testimony may be admitted "to help explain the operation, structure, membership, and terminology of organized crime families" such as the Gambino family. *United States v. Locascio*, 6 F.3d 924, 936 (2d Cir. 1993). This Court has also permitted expert testimony regarding the organization and structure of organized crime families in prosecutions brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO") where proof of an ongoing racketeering enterprise is required. *See*,

*e.g.*, *United States v. Amuso*, 21 F.3d 1251, 1263-64 (2d Cir. 1994). Although such expert testimony is not limited to RICO cases, it has been "carefully circumscribed . . . to occasions where the subject matter of the testimony is beyond the ken of the average juror." *Castillo*, 924 F.2d at 1232. This is one such case. For instance, McCabe described the particular roles played by organized crime family members, thereby giving the jury insight that it might not otherwise have. *See Amuso*, 21 F.3d at 1264 (noting that "the operational methods of organized crime families are still beyond the knowledge of the average citizen"). McCabe's testimony also put into context Lombardozzi's argument that he was unaware that Isoldi was loaning money to Leung. *Cf. Headley v. Tilghman*, 53 F.3d 472, 475 (2d Cir. 1995) ("Where the accused's defense is that he was on the scene but unaware of any drug transaction, we have held that expert testimony may be introduced to explain the defendant's role in the transaction."). Finally, McCabe's testimony did not "ask the jury to infer [Appellant's] guilt from the conduct of unrelated individuals." *Id*. at 476. Rather, it merely provided a means by which the jury could understand Lombardozzi's role in the crimes charged; the other evidence was sufficient to link Appellant to the extortionate loan. Thus, the admission of McCabe's testimony was not manifestly erroneous.

### B. *Evidence of prior bad acts*

Lombardozzi also challenges the district court's admission of evidence related to prior extortionate loans. In particular, he argues, pursuant to Federal Rule of Evidence 404(b), that the district court abused its discretion in admitting the testimony of Peter Perrotta and Ronald Massie, Isoldi's loansharking customer and associate respectively. In relevant part, Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed. R. Evid. 404(b). This Court reviews "404(b) evidence under an 'inclusionary approach' and allows evidence 'for any purpose other than to show a defendant's criminal propensity.'" *United States v. Garcia*, 291 F.3d 127, 136 (2d Cir. 2002) (quoting *United States v. Pitre*, 960 F.2d 1112, 1118 (2d Cir. 1992)). "To determine if the court properly admitted prior act evidence pursuant to Rule 404(b), we consider whether: (1) the prior act evidence was offered for a proper purpose; (2) the evidence was relevant to a disputed issue; (3) the probative value of the prior act evidence substantially outweighed the danger of its unfair prejudice; and (4) the court administered an appropriate limiting instruction." *Garcia,* 291 F.3d at 136. A district court's decision to admit evidence of prior bad acts is reviewed for abuse of discretion, which we will find only if the judge acted in an arbitrary and irrational manner. *Id.*

The district court did not abuse its discretion by allowing the government to introduce the testimony of Perrotta and Massie. Here, Lombardozzi attempted to distance himself from Isoldi by asserting that he was not involved with Isoldi's loans to Leung. Perrotta's and Massie's testimony establishing similar acts of extortion that Lombardozzi committed with Isoldi in the past, however, directly contradicted that assertion, and thus is both relevant and highly probative. Furthermore, the district court issued a proper limiting instruction. It instructed the jury that it "may not consider the evidence of the similar conduct as a substitute for [proof] that the defendant committed the crime charged" and was to consider the evidence only as proof of

Lombardozzi's intent, absence of mistake, and identity. Accordingly, the district court did not abuse its discretion by allowing the government to present evidence of prior bad acts.

### C. Grand jury testimony

Finally, Lombardozzi contends that his indictment should be dismissed because Agent Bryceland misled the grand jury into believing that Leung feared for his safety and that his fear was based on an interaction with Isoldi. In support of his argument, Lombardozzi points to Agent Bryceland's grand jury testimony that Leung "understood that if he didn't make his payment, physical harm would come to him" and "the basis of [Leung's] concern was the conversations [Leung] had with Mr. Isoldi." Lombardozzi asserts that no proof was offered at trial in support of Agent Bryceland's grand jury testimony on this point, and argues that this lack of proof, coupled with Leung's trial testimony that he continued to make loan payments because it was only "fair," demonstrates that Agent Bryceland misled the grand jury.

"[D]ismissal of an indictment following a conviction is an 'extraordinary' remedy." *United States v. Casamento*, 887 F.2d 1141, 1182 (2d Cir. 1989). Indeed, "to warrant dismissal of an indictment after a conviction, 'the prosecutor's conduct [must] amount[ ] to a knowing or reckless misleading of the grand jury as to an essential fact.'" *Id.* (quoting *United States v. Bari*, 750 F.2d 1169, 1176 (2d Cir. 1984)). In addition, the mere fact that evidence presented to the grand jury was unreliable, misleading, or inaccurate, is not sufficient to require dismissal of an indictment. *Bank of Nova Scotia v. United States,* 487 U.S. 250, 260-61 (1988). Here, there is no basis to conclude that Agent Bryceland knowingly or recklessly misled the grand jury. At trial, Agent Bryceland testified that in February of 2001 Leung said "that he [was] concerned about his safety due to the type of people that he believes Mr. Isoldi and Mr. Scotto are" and that

27

he felt "'they would do harm to him personally or to his restaurant if he did not make timely payments.'" This testimony was based on Agent Bryceland's memorandum of a conversation he had with Leung that had been admitted into evidence. Agent Bryceland's testimony at trial regarding Leung's state of mind was, therefore, substantially consistent with his testimony before the grand jury.

Even if the grand jury were misled into believing that Agent Bryceland had evidence that Leung's fear was based on a specific interaction with Isoldi, Lombardozzi has not shown that such misleading was reckless or intentional or anything more than Agent Bryceland's simple inability to remember accurately all of the details of a conversation he had with Leung some two years before his grand jury testimony. In addition, the fact that Agent Bryceland's testimony before the grand jury was at odds with Leung's trial testimony in no way proves that Agent Brycelend's grand jury testimony was false. Finally, even if we were to find that the grand jury indictment was defective, all of the discrepancies between Agent Bryceland's grand jury testimony and the evidence at trial were submitted to the petit jury which found Lombardozzi guilty beyond a reasonable doubt. It is well settled that a guilty verdict at trial "remedies any possible defects in the grand jury indictment." *United States v. Eltayib*, 88 F.3d 157, 173 (2d Cir. 1996) (citing *United States v. Mechanik*, 475 U.S. 66, 72-73 (1986)).

## Conclusion

For the foregoing reasons the judgment of the district court is AFFIRMED. Lombardozzi has moved for a remand to the District Court for reconsideration of his sentence pursuant to *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). The case is hereby remanded for that

purpose unless Lombardozzi now withdraws his motion for remand or, within ten days of the issuance of the mandate in this appeal, Lombardozzi informs the District Court that he no longer wishes to have his sentence reconsidered.