13-1955-cr
*United States v. Ramirez*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 3rd day of October, two thousand fourteen.

Present:
      ROSEMARY S. POOLER,
      PETER W. HALL,
      SUSAN L. CARNEY,
            *Circuit Judges,*

_____

UNITED STATES OF AMERICA,

        *Appellee,*

      v.                                        No. 13-1955-cr

JUAN RAMIREZ, AKA SCARFACE, AKA TONY TKO,

        *Defendant-Appellant.*

_____

FOR APPELLANT:      Jesse Michael Siegel, Law Office of Jesse M. Siegel, New York, NY.

1

FOR APPELLEE:        Michael D. Lockard & Karl Metzner, Assistant United States Attorneys, *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, NY.

Appeal from a judgment of the United States District Court for the Southern District of New York (Carter, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

Defendant-Appellant Juan Ramirez appeals his 2002 conviction on numerous charges, including racketeering and racketeering conspiracy; kidnapping, murder, attempted murder, assault, and interstate travel in aid of racketeering; conspiracy to distribute narcotics; and robbery and conspiracy to commit robbery. In its indictment, the Government alleged that Ramirez was the leader of the "165th St. Organization" (the "Organization") that from 1992 to 1998 operated a car theft scheme, engaged in narcotics trafficking, and committed various acts of murder, attempted murder, and robbery in furtherance of those endeavors. During Ramirez's jury trial, which lasted nearly two months, the Government introduced the transcripts of plea allocutions given by five co-conspirators in which those co-conspirators admitted to their involvement in various criminal acts that formed the bases of some of the charges against Ramirez. The jury ultimately found Ramirez guilty of the above charges but acquitted him of several others. Ramirez now argues that the admission at trial of the five co-conspirator plea allocutions violated his right to confront the witnesses against him, as articulated in *Crawford v. Washington*, 541 U.S. 36 (2004).[1] We assume the parties' familiarity

---

[1] Although we originally affirmed Ramirez's conviction in December 2003, *see United States v. Martinez*, 83 F. App'x 384, 385 (2d Cir. 2003) (summary order), *vacated in part by Calcano v.*

2

with the underlying facts and the procedural history of the case, which we reference only as necessary to explain our decision.

*Crawford* holds that the Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 53–54. It is constitutional error, therefore, to admit "as substantive evidence a plea allocution by a co-conspirator who does not testify at trial unless the co-conspirator is unavailable and there has been a prior opportunity for cross-examination." *United States v. Riggi*, 541 F.3d 94, 102 (2d Cir. 2008) (internal quotation marks omitted). Although the Government concedes that, in the wake of *Crawford*, it was error to admit the five plea allocutions at Ramirez's trial, Ramirez did not object to their admission, and so this Court's review is for plain error. *See id.*

Plain error is "(1) error, (2) that is plain, and (3) that affects substantial rights." *United States v. Hardwick*, 523 F.3d 94, 98 (2d Cir. 2008) (internal quotation marks omitted). If all three conditions are met, this Court "may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affected the fairness, integrity, or public reputation of [the] judicial proceedings." *Id.* (internal quotation marks omitted). In this case, the admission of the plea allocutions easily satisfies the first two conditions—the Government

_____

*United States*, 543 U.S. 801 (2004), we recalled our mandate after the Supreme Court decided *Crawford* and directed the parties to brief any *Crawford* issues. Two of Ramirez's co-defendants complied with our instructions but Ramirez did not and so we concluded that he had abandoned the *Crawford* issue. We again affirmed the convictions of Ramirez's co-defendants in August 2005. In August 2013, we reinstated Ramirez's direct appeal and gave him permission to file a *Crawford* brief after the district court granted his 28 U.S.C. § 2255 motion asserting that his original appellate counsel was ineffective for failing to file the *Crawford* brief as we had directed.

3

concedes the error and that error is "clear" and "obvious" in light of *Crawford* and this Court's decisions holding that co-conspirator plea allocutions are testimonial hearsay. *Id.* (citing cases and observing that "[a]n error is plain if it is clear or obvious at the time of appellate consideration" (internal quotation marks omitted)). The success of Ramirez's appeal therefore turns on the third condition of the plain error test: whether the error affected his substantial rights. To meet this standard, he must show that the error was "prejudicial," meaning that "there must be a reasonable probability that the error affected the outcome of the trial." *United States v. Marcus*, 560 U.S. 258, 262 (2010); *see also Riggi*, 541 F.3d at 102.[2] Because we ultimately find that Ramirez does not make the required showing on this factor, we need not address the fourth condition and determine whether to exercise our discretion to notice the forfeited error.

The facts presented by the appeal in *Riggi* are similar to those that we confront here: *Riggi* also involved a racketeering charge, multiple underlying conspiracies, and the pre-*Crawford* admission of co-conspirator plea allocutions. *See Riggi*, 541 F.3d at 95–96. In *Riggi*, as here, the Government introduced the plea allocutions to corroborate the testimony of cooperating witnesses as to the existence of charged conspiracies with a broad range of objectives. *See id.* at 103. Reviewing for plain error, we concluded that the admission of the plea allocutions in that case affected the defendants' substantial rights and required the

---

[2] When the source of plain error is a supervening decision, we have employed a "modified plain error standard" that places the burden on the Government to prove that the error did not affect the defendant's substantial rights. *See Riggi*, 541 F.3d at 102 n.3. We need not decide whether the Supreme Court's decision in *Johnson v. United States*, 520 U.S. 461 (1997), requires that we place the burden on the defendant in such cases because we find the error in this case did not affect Ramirez's substantial rights even under our more lenient modified standard. *See United States v. Lombardozzi*, 491 F.3d 61, 74 n.4 (2d Cir. 2007).

vacatur of their convictions. *See id.* at 108. To reach that conclusion, we examined six factors relevant to the circumstances of that case—the number of plea allocutions introduced, the presence of "interlocking . . . conspiracies," the detailed nature of the allocutions, the ways in which the allocutions were used by the Government during its summation, the district court's limiting instructions, and the strength of the Government's other evidence. *See id.* at 103–08. In Ramirez's case, however, these considerations lead us to conclude that his substantial rights were not affected by the erroneous admission of the allocutions. Namely, while the level of detail contained in some of the allocutions and the use to which the Government put the allocutions in summation bear certain similarities to the circumstances in *Riggi*, the remaining considerations, especially the strength of the Government's other evidence, preclude a determination that the admission of the allocutions violated Ramirez's substantial rights.

### 1.  Allocution Details & Use of the Allocutions in Summation

In *Riggi* we expressed concern that the "detailed content of the plea allocutions corresponded to the elements of [the] crimes charged against [the] defendants." *Riggi*, 541 F.3d at 104. We also noted that the allocutions were "woven throughout" the Government's summation. *Id.* at 108. Of particular concern was the fact that, during its summation, the Government: (1) reminded the jurors to consider the allocutions as evidence that the conspiracies existed; (2) repeatedly used the allocutions to corroborate the testimony of cooperating witnesses and bolster the credibility of those witnesses; and (3) again urged the jury to consider the allocutions as evidence of the crimes in the last words of its summation. *See id.* at 106–08.

5

Of the plea allocutions in this case, Manuel Gonzalez's is the most detailed and damaging to Ramirez. Although he did not name Ramirez in his allocution, Gonzalez confirmed the existence of the Organization, stated that the Organization was headed by "another" person, and admitted that, at the behest or direction of that "other" person, he had "committed four acts charged as racketeering." *See* Supp. App'x at 1052–53. As was the case in *Riggi*, each of the "racketeering acts" listed and described by Gonzalez correspond to four such acts charged against Ramirez, including the March 1994 murder of Felix Rodriguez, the March 1995 conspiracy to kidnap and murder Francisco Soto, and the June 1995 attempted murder of an individual in Reading, Pennsylvania. In summation, the Government also relied heavily upon the Gonzalez allocution and those of the other co-conspirators. It several times read long sections of the allocutions to the jurors, repeatedly urging them to use the allocutions as proof that the Organization existed. *See, e.g.*, Supp. App'x at 1220–21, 1266–67. More troublingly, it encouraged the jurors to use the allocutions as corroborating proof that Ramirez participated in and led the Organization by identifying him as the "other" person referenced in those allocutions. As in *Riggi*, the Government's reliance on the allocutions in summation, along with the detailed nature of the allocutions, weigh in favor of vacatur. *See Riggi*, 541 F.3d at 106–08.

### 2. Strength of the Government's Other Evidence

Notwithstanding the above, our consideration of the other factors relevant in *Riggi* convinces us that vacatur is unwarranted in this case. The strength of the Government's other evidence of Ramirez's guilt constitutes the critical difference between this case and *Riggi*. Ramirez argues that the Government could not have proved the existence of a

6

racketeering "enterprise" without the challenged plea allocutions. This argument drastically understates the strength of the Government's other evidence on this point. "A RICO enterprise is a group of persons associated together for a common purpose of engaging in a course of conduct, proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Burden*, 600 F.3d 204, 214 (2d Cir. 2010) (internal quotation marks omitted). This definition is very broad:

> [A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose. Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence.

*Boyle v. United States*, 556 U.S. 938, 948 (2009).

While the Organization does not appear to be as rigidly structured as some, the live testimony of five cooperating witnesses was more than sufficient to prove that a continuing narcotics trafficking/car theft/armed robbery enterprise existed. With respect to the drug distribution side of the business, the Organization had a clear, if loose, hierarchy with Ramirez at its head. He was responsible for obtaining, either by purchase or by theft, the powder cocaine that others "cooked" into crack cocaine and then distributed to street-level sellers. *See* Supp. App'x at 101–02, 108, 332–35. Ramirez also provided protection for the

7

drug business by defending the "spot" and intimidating rival dealers. *See id.* at 108, 337–38, 347–49. The remaining members of the group assisted Ramirez with specific jobs, such as robbing rival drug dealers, and received in return a cut of the proceeds. *Id.* at 603–04, 611, 614–15, 1009–10, 1019–20.

The live testimony at trial further demonstrated that the car theft side of the operation had a structure similar to that of the narcotics business—Ramirez was in charge of the operation, generally planned the heists, and stored stolen car parts in his basement. *See* Supp. App'x at 764, 957, 965. The Organization had a number of techniques it regularly employed to carry out the car thefts, including the use of walkie-talkies, decoy cars, and lookouts. *Id.* at 755, 760–61, 960–61. Members of the group would take orders for particular car parts from potential buyers and pass those orders along to Ramirez, who then organized the theft of specific cars to fill those orders. *See id.* at 667, 756, 957. The payment structure of the car theft ring was similar to the narcotics business—those who participated in a given theft would take a cut of the proceeds. *Id.* at 762. Finally, core members of the group participated both in the car thefts and in the armed robberies undertaken to further the narcotics distribution business. *See id.* at 614–15, 667, 961–65, 1019–20.[3] Several police and civilian witnesses corroborated the existence and general tactics of the car theft ring. For example, a police officer testified that he arrested Ramirez and Gonzalez in January 1996 as they attempted to steal a parked car and, after the arrest, recovered a two-way radio from Ramirez. *See id.* at 878–83; *see also id.* at 921–23 (testimony of employee of a business that

---

[3] The same general cast of characters participated in many of the charged racketeering acts, including the Felix Rodriguez murder, *see* Supp. App'x at 437–38, 663–66, 993-95, the Soto kidnapping and murder, *see id.* at 140–42, 369, 623–25, and the Reading attempted murder, *see id.* at 403–07, 653–57, 782–84.

bought stolen parts), 1107–08, 1133–34 (Ramirez's testimony in defense admitting to being a "car thief" and that he and others, including Gonzalez, "st[ole] cars together").

The above is strong evidence that a continuing enterprise existed and that Ramirez was its leader. *See, e.g., Burden*, 600 F.3d at 214–15 (enterprise found where a group had: (1) "multiple members" with the shared purpose of selling drugs; (2) a defined "meeting place"; (3) a hierarchical structure with one head man who controlled the flow of drugs and organized acts of violence; and (4) the group conducted acts of retaliation upon those who threatened the business); *United States v. Jones*, 482 F.3d 60, 69–70 (2d Cir. 2006) (sufficient evidence that the defendant ran a drug-selling enterprise where he provided the drugs for sale, enforced the group's "exclusive control" over an area, and directed a number of "lieutenants"). Ramirez's argument that the plea allocutions were the Government's "only evidence" as to the existence of the racketeering enterprise is unpersuasive.

Similarly, the Government's case with respect to the remaining conspiracies (the Felix Rodriguez murder, the Soto kidnap and murder, and the Reading attempted murder), was based on the above-referenced testimony of the various cooperating witnesses, bolstered by the testimony of numerous other non-cooperating civilian witnesses, investigating officers, and medical examiners. *See* Supp. App'x at 15–21 (testimony describing physical evidence seized from Ramirez's apartment), 34–37 (eyewitness testimony detailing Soto's abduction), 305–11 (medical examiner testimony regarding the Soto and Rodriguez murders), 810–12 (eyewitness testimony regarding Rodriguez murder), 944–48 (testimony regarding the discovery of an abandoned blue van registered to Ramirez's father the day after Soto's murder). The challenged plea allocutions are wholly cumulative of this extensive other

9

evidence. Indeed, we have already held when addressing the *Crawford* appeals of Ramirez's co-defendants that the information contained in the plea allocutions relating to the Soto kidnap and murder and the Reading attempted murder was independently corroborated, and that any inconsistencies in the cooperating witness testimony were minor. *See United States v. Martinez,* No. 02-1080, slip op. at 5, 7 (2d Cir. Aug. 15, 2005) (unpublished summary order). In *Riggi*, by contrast, the cooperating witness testimony "contained inconsistencies and contradictions" and the Government itself "betrayed anxiety about the persuasiveness" of some of its physical evidence. 541 F.3d at 105. Given the weight of the Government's other evidence against Ramirez, we conclude that the introduction of the plea allocutions did not affect his substantial rights.

### 3.    Remaining *Riggi* Considerations

This conclusion is also supported by the three other factors considered in *Riggi*. First, as *Riggi* suggests, prejudice may be indicated merely by the number of plea allocutions introduced at trial. *See Riggi*, 541 F.3d at 103. Here, however, fewer allocutions (five) were admitted than in *Riggi*, where the jury heard eight. Moreover, two of the five plea allocutions admitted here related to a charge of which Ramirez was *acquitted*: a May 1994 robbery of an AIDS clinic in the Bronx. This observation reduces the pool of potentially prejudicial allocutions to three. Finally, those three allocutions were presented over the course of a seven-week-long trial, whereas in *Riggi* the eight relevant allocutions played a role in a trial that ran half as long. The lesser number of prejudicial allocutions and their introduction over the course of a much longer trial suggests that the allocutions in this case were less likely to have been prejudicial than those introduced in *Riggi*.

10

Second, in *Riggi* we expressed concern that many of the charged conspiracies "overlapp[ed]" such that the introduction of plea allocutions confirming the existence of one conspiracy "naturally reinforced the evidence of the others, creating an echo chamber of implied guilt." *Id.* at 103–04. Here, the charged conspiracies discussed in the plea allocutions did not so overlap. Rather than being related, each conspiracy in this case was born of a separate motive—Felix Rodriguez was murdered because he had once kidnapped Ramirez, the plot to kidnap and murder Francisco Soto was hatched because he was a drug courier thought to be in possession of a large quantity of cocaine, and the Organization unsuccessfully attempted to murder the individual in Reading, Pennsylvania because he had stolen the group's drugs. Moreover, there is no evidence that the victims in the three conspiracies had any relationship—Soto was not kidnapped and murdered because he knew something about or was involved in the earlier Rodriguez murder, nor was the Reading individual affiliated with Soto. *Contra Riggi*, 541 F.3d at 103–04. Thus, while each of the conspiracies involved some of the same actors, the disparate motives and victims weigh against a conclusion that the plea allocutions "confirming the existence of one of the . . . conspiracies naturally reinforced the evidence of the others." *Id.* at 104.

Finally, in its jury instructions, the district court informed the jurors that they could consider the plea allocutions in regard to the existence of the charged conspiracies and the involvement of the makers of the statements in the alleged conspiracies. *See* Supp. App'x at 1353–54. The court cautioned the jury that, should it conclude the conspiracies existed, it "must decide as a separate question whether [each] defendant . . . was part of each alleged conspiracy based entirely on other evidence in the case." *Id.* at 1354. In *Riggi*, we found

11

similar cautionary instructions insufficient to "inoculate[] against the error" because there was an exact "correlation" between the counts of conviction and the counts for which the allocutions were offered, *i.e.* the jury convicted the defendants on the counts supported by plea allocutions and acquitted them on all others. *See Riggi*, 541 F.3d at 104-05 (internal quotation marks omitted).

Here, there is no such congruence. As noted above, the jury acquitted Ramirez of three counts involving a May 1994 robbery of an AIDS clinic, which was the subject of two plea allocutions. In addition, the jury convicted Ramirez on counts unsupported by plea allocutions. For example, Counts Thirteen and Fourteen of the indictment charged Ramirez with robbery and conspiracy to commit robbery based on a 1994 robbery of a drug dealer's apartment, while Count Twenty-One charged him with use of a firearm in connection with a January 1995 attempted murder. *See* App'x at 57, 60, 70. None of the plea allocutions referred to the subject matter of these counts, but the jury nonetheless convicted Ramirez of the charges. Rather than suggesting that the jury was "unable to follow the court's instructions," *see Riggi*, 541 F.3d at 104–05, the above indicates that the jury heeded the instructions and that the allocutions did not have an overwhelming influence on the jury's decision. *Cf. United States v. Reifler*, 446 F.3d 65, 90 (2d Cir. 2006) (finding *Crawford* error harmless given the "discerning nature of the verdicts" and the jury's "differentiation" between defendants and evidence).

For all of these reasons we conclude that the erroneous admission of the plea allocutions did not affect Ramirez's substantial rights, and their admission did not constitute plain error. We have considered all of Ramirez's remaining arguments, including those

12

contained in his supplemental *pro se* brief, and have concluded that they are without merit.

We **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk
