06-1280-cr
USA v. Riggi (Mannarino)

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2007

(Argued: May 29, 2008          Decided: September 4, 2008)

Docket Nos. 06-1280-cr(L), 06-2683-cr(con),
06-2862-cr(con), 06-2878-cr(con), 06-2910-cr(con)

- - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,

Appellee,

- v.-

GIOVANNI RIGGI, MICHAEL SILVESTRI,
GIROLAMO PALERMO, also known as Jimmy
Palermo,

Defendants,

ANTHONY MANNARINO, also known as
Anthony Marshmallow, GIUSEPPE
SCHIFILLITI, also known as Pino
Schifilliti, PHILIP ABRAMO, LOUIS
CONSALVO, also known as johndoe8, also
known as Louie Eggs, also known as
Frank Scarabino, STEFANO VITABILE, also
known as Steve Vitabile,

Defendants-Appellants.

- - - - - - - - - - - - - - - - - - - -X

Before:  JACOBS, Chief Judge, CALABRESI and SACK,
Circuit Judges.

Appeals from judgments of conviction following a jury trial in the United States District Court for the Southern District of New York (Mukasey, J.). Because it was plain error (in retrospect) to admit eight plea allocutions in violation of Crawford v. Washington, 541 U.S. 36 (2004), we vacate the convictions and remand for further proceedings.

ROLAND G. RIOPELLE, Sercarz & Riopelle, LLP, New York, NY, for Defendant-Appellant Guiseppe Schifilliti.

INGA L. PARSONS, Law Offices of Inga L. Parsons, Marblehead, MA, for Defendant-Appellant Philip Abramo.

SANFORD TALKIN, Talkin, Muccigrosso & Roberts, LLP, New York, NY, for Defendant-Appellant Stefano Vitabile.

JOHN M. HILLEBRECHT, Assistant United States Attorney (Miriam E. Rocah, Katherine Polk Failla, Assistant United States Attorneys, on the brief), for Michael J. Garcia, United States Attorney for the Southern District of New York, New York, NY, for Appellee.

DENNIS JACOBS, Chief Judge:

Stefano Vitabile, Philip Abramo, and Giuseppe Schifilliti (collectively, "defendants") appeal from judgments of conviction, entered following a three-week jury

trial in the United States District Court for the Southern District of New York (Mukasey, J.), on charges arising out of their involvement in the Decavalcante organized crime family. The charges include racketeering and racketeering conspiracy, murder and conspiracy to commit murder, conspiracy to commit extortion in the construction industry, conspiracy to make and to collect extortionate extensions of credit, and conspiracy to commit securities fraud. Defendants challenge their convictions on several grounds, of which we reach two: (i) that the admission of eight plea allocutions of non-testifying co-conspirators amounted to plain error under the intervening authority of Crawford v. Washington, 541 U.S. 36 (2004); and (ii) that the evidence was insufficient to support the convictions on three counts. We find merit in the Crawford claim, vacate the judgments and remand the case for further proceedings.

## BACKGROUND

These prosecutions arose out of a lengthy investigation into organized crime, culminating in the October 2000 arrests of more than twenty persons (including Vitabile, Abramo, and Schifilliti), and the filing of multiple indictments. The case against the three defendants here

3

went to trial on a nine-count superseding indictment. Counts One and Two alleged racketeering and racketeering conspiracy under 18 U.S.C. § 1962(c) and (d). These two counts encompassed, as predicate acts, twelve substantive allegations, some of which were then also set forth as separate offenses in Counts Three through Nine. After a three-week trial held in Spring 2003, the jury found defendants guilty of the first two counts (including that the government had proven ten of the predicate acts), and, among them, five of the remaining substantive counts.

**A. Trial**

We summarize the facts in the light most favorable to the government, given the defendants' convictions. United States v. Mapp, 170 F.3d 328, 331 (2d Cir. 1999). For the period relevant to the indictment, the Decavalcante organized crime family, like many mob families, was led by a "boss," aided by an "underboss" and a "counselor" or "consigliere." They supervised multiple crews of hoodlums, each led by a captain and manned by soldiers (who have been formally inducted as members of the family) and associates (non-members). The family was run by an "administration" made up of top leadership and the various captains.

4

Defendants are long-time members and leaders of the Decavalcante family. Vitabile served as consigliere for approximately 35 years; Abramo had been a captain since the late 1980s; Schifilliti had been a captain since 1991. At all relevant times, the three defendants were members of the family's administration. Vitabile was also a member of the "ruling panel," a group formed when a boss is imprisoned or otherwise incapacitated.

The government's evidence at trial included testimony from four cooperating witnesses, each of whom had known all three defendants for decades and had run the various rackets and served as enforcers side-by-side with them. They were (in descending order of rank in mob hierarchy): (1) Vincent Palermo (no relation to Girolamo Palermo, whose separate appeal is also decided today), a long-time captain who was a member of the family's ruling panel and became an acting boss at one point; (2) Anthony Rotondo, a captain; (3) Anthony Capo, a soldier; and (4) Victor DiChiara, an associate. Of these cooperating witnesses, at least one-- and usually more than one--testified about defendants' involvement in each of the charged crimes.

The government also presented testimony from expert witnesses, law enforcement officers, and family members of

some mob victims; surveillance photographs and video; tape-recorded conversations; documentary evidence; and the guilty plea allocutions of eight non-testifying co-conspirators. In order to assess the impact of the allocutions upon the convictions, and to assess sufficiency of evidence, it is necessary to summarize in some detail the evidence supporting each of the proven predicate acts and substantive counts. (The defendants named in the various charges are specified in parentheses.)

*1. Conspiracy to murder and murder of Frederick Weiss (Abramo).* Weiss, an associate of the Decavalcante Family, was a defendant (along with some members of the Gambino organized crime family) in a prosecution for illegal dumping of garbage. The Gambino family suspected Weiss of cooperating with the government, and asked the Decavalcante family to kill him. Tr. 193-94. Abramo attended a series of meetings in which the murder was planned. Tr. 200, 202-03, 973-74, 976-80, 985, 992-93, 2105, 2115. Abramo cased the area around Weiss's home (the proposed spot for the murder), reported back to then-boss John Riggi about the plan, and on the day of the murder, drove around the area with underboss John D'Amato in case back-up or a diversion would be needed. Tr. 979-80. Cooperating witness Palermo,

6

who was assigned to shoot Weiss, testified that while he was waiting for Weiss to appear, he saw Abramo and D'Amato driving around the neighborhood. Tr. 2120. As Weiss walked from his house to his car parked in front, he was gunned down by Palermo and another family member. Tr. 222, 2121. When the shooters gave their report to Abramo and D'Amato, Tr. 2122, Abramo or D'Amato replied, "We know. We heard the shots." Tr. 998. Later that day, Abramo and D'Amato met at a restaurant with Palermo and two other cooperating witnesses to congratulate them. Tr. 2123.

　　*2. Conspiracy to murder and murder of Joseph Garofano (Abramo).* Garofano was one of the participants in the Weiss hit. His fear that he might be arrested prompted concern in the Decavalcante family that he might cooperate with the government, Tr. 514-15, 996, 1017-18, 1021, so the family leadership decided to kill him too. Again, Abramo participated in planning meetings with other family members. Tr. 1017-18, 1020-22, 2128-32. Cooperating witness Rotondo testified about two meetings he attended with Abramo and D'Amato within a week of the Weiss murder. Tr. 1019, 1032. During those meetings, Abramo urged that Garofano be killed (because "he saw everybody that was there at the [Weiss] hit," Tr. 1021), assigned a soldier in his own crew to carry

7

out the murder, Tr. 1023, and helped to devise and implement the plan by which the hit man would ambush his victim, Tr. 1032-36. On the day of the murder, Rotondo reported to Abramo and warned him to avoid being spotted by Garofano. Tr. 1036. Rotondo then drove Garofano to the site of the hit, and stood guard while Garofano was shot to death. Tr. 1039-40.

*3. Conspiracy to murder Annunziata and Vastola (Abramo)*. Daniel Annunziata and Gaetano "Corky" Vastola, members of the Decavalcante family, were targeted for execution because: Annunziata had refused to allow the Weiss murder to take place at the construction site of his new home, Tr. 964, 980-87, 1052-58; and Vastola, Annunziata's brother-in-law, backed him up and also threatened to "go to war" with the Gambino family rather than kill Weiss at their request, Tr. 209. On one occasion, Abramo and D'Amato met with Annunziata and Vastola to try to get them to come around, and ordered Capo and Palermo to keep watch outside and kill Annunziata and Vastola if anything went wrong. Tr. 206.

Abramo and D'Amato subsequently ordered Capo and Palermo to kill Annunziata and Vastola, Tr. 204, 980-81, 2111, but the intended victims got away, Tr. 2112. Abramo

8

attended several follow-up meetings, but the murders were never carried out. Tr. 1052-58. Ultimately, Annunziata and Vastola somehow made amends and were allowed back into the Decavalcante family. Tr. 1057-58.

*4. Conspiracy to murder and murder of Louis LaRasso (Vitabile, Abramo, and Schifilliti).* LaRasso was a Decavalcante captain who was deemed a threat to boss John Riggi (who was then in jail) and acting boss John D'Amato. Tr. 124, 322-23, 1066-68. At a mid-1991 meeting that included all three defendants, the family administration voted to kill LaRasso. Tr. 325-36, 1069-74, 2355, 2359. The plan was for Schifilliti to lure LaRasso to meeting at the home of one of Schifilliti's soldiers. Members of Abramo's crew would kill him there, dispose of his body, and leave his car at the airport. Tr. 326-27, 1074-76, 2359-61.

Mrs. LaRasso testified that her husband went missing on November 11, 1991. Tr. 2669-71. LaRasso's car was found at the airport. Tr. 2672-73. In mid-November, Abramo advised Rotondo and Palermo that LaRasso had been killed. Tr. 1078-79. Rotondo testified that he learned from other mob members that Abramo was responsible for LaRasso's murder, and that Schifilliti had been nauseated at the scene. Tr. 1079-82.

*5. Conspiracy to murder and murder of John D'Amato (Vitabile).* Several family members, including cooperating witnesses Capo, Rotondo and Palermo, wanted to get rid of John D'Amato--his offenses were usurpation, Tr. 1101-02, stealing from the family, Tr. 1096-97, 1101-02, 2155-56, 2177, and sex with men, Tr. 388-90, 1098-1100, 2157-58--but they needed permission of someone in authority. Tr. 390-91, 1100-01, 2159. At a meeting in November 1991, Vitabile authorized the murder and suggested how and where to dispose of D'Amato's body. Tr. 1107-10, 2159-62. Shortly thereafter, Capo (accompanied by DiChiara) shot D'Amato to death in a car. Tr. 397-98, 1619-20. D'Amato's body was never recovered.

*6. Conspiracy to murder Thomas Salvata (Vitabile).* Salvata, an associate on the crew of cooperating witness Palermo, worked at Palermo's dancing establishment ("Wiggles") and picked up loansharking money at a restaurant in which Palermo had an interest. Tr. 2308-09, 2151. After search warrants were executed at the restaurant--and one of Palermo's loansharking books was confiscated--Palermo grew suspicious that Salvata was cooperating with the government. Tr. 2150-52. Palermo asked Vitabile to find "someone to dig a hole for me so I could put Tommy [Salvata] in there." Tr.

10

2153. Vitabile put Palermo in touch with another Decavalcante captain who was working on a construction project. Id. The murder plans were postponed because of the security arrangements at the construction project. Palermo had second thoughts and called off the hit. Tr. 2154.

7. *Conspiracy to murder Frank D'Amato (Vitabile and Schifilliti)*. Shortly after the murder of acting boss John D'Amato, his brother Frank was released from prison. Those involved in the murder--including Vitabile, Schifilliti, Capo, Palermo and Rotondo--thought it prudent to kill Frank before he took revenge. Tr. 410, 1128-29. The Decavalcante family's administration--including Vitabile and Schifilliti--voted to authorize Capo (who was not present) to kill Frank D'Amato. Tr. 424-27, 1131-37, 2180-86. Vitabile later told Capo to kill Frank at the first opportunity. Tr. 427. The murder never took place.

8. *Conspiracy to commit extortion in the construction industry (Vitabile and Schifilliti)*. The Decavalcante family controlled the Laborers International Union of North America, Local 394, and the Asbestos Union, Local 1030. Tr. 262-63, 266, 271-76, 278-80, 1144, 1155, 1159, 1571, 2192, 2209. The family's control was used to extort kickbacks

11

from contractors who wanted to use non-union labor, and bought labor peace in exchange for cash payments and "no show" jobs. Tr. 267, 1156-58, 1573, 2201-04. Contractors who resisted the family were subject to violent attacks, strikes and picket lines, Tr. 863-64, and were assigned particularly uncooperative union workers, Tr. 1158. Uncooperative union officials were subjected to threats and violence. Tr. 264-65, 284-89, 1574-79, 2198-99.

Capo testified to using a pipe to beat a union member who was making trouble for one union official controlled by the family. Tr. 264-65. Capo and DiChiara testified that on a separate occasion, Schifilliti ordered them to bludgeon a union official who was disobeying orders. Tr. 284-289, 1574-79. Palermo testified that he once delivered $70,000 to Schifilliti, who explained to him that the payment was for letting a company work non-union. Tr. 2202-05.

*9. Conspiracy to make and to collect extortionate extensions of credit (Abramo and Schifilliti).* Abramo, known as a "Shylock's Shylock," ran one of the most successful loansharking operations in the Decavalcante family. Tr. 1145. Rotondo testified as to details of the operation, some of which he learned directly from Abramo, including the names of Abramo crew members who worked the

12

racket and the transaction in which Abramo loaned money to Frank D'Amato, who was setting up his own subsidiary loansharking business.  Tr. 1146-47.  Rotondo also testified about conversations with Palermo, who described how he took care of Abramo's loansharking business when Abramo was imprisoned in Florida.  Tr. 1146-47.  Palermo corroborated this testimony, explaining how Abramo handed over the reins of his loansharking business before he was surrendered to law enforcement.  Tr. 2237, 2251-52, 2266-72.

Palermo also supplied testimony about Schifilliti's involvement in loansharking business.  Schifilliti had boasted to Palermo in the early 1990s that he had started loansharking and "like[d] it."  Tr. 2282.  Schifilliti solicited Palermo as a partner in the business and also as a supplier of soldiers for collection purposes.  Tr. 2282, 2037.

*10.  Conspiracy to commit securities fraud (Abramo).* Abramo ran Sovereign Equity Management Corporation, a boiler room operation.  Tr. 1717-1718, 2238-41.  For the most part, Sovereign brokers engaged in "cold calling . . . prospective customers on the phone and try to sell them bogus stocks, fake stocks."  Tr. 348-49.  A portion of the proceeds was kicked up to family leadership.  Tr. 351-52.  Abramo's

13

associate Vincent DiChiara testified that Abramo: controlled most aspects of the company (personnel, deals, customer complaints) while carefully hiding his involvement, Tr. 343, 345, 1717-21, 1729, 1733-35, 1746, 1760-61; kept the two sets of books, Tr. 1720-21; and instructed DiChiara on precautions for avoiding law enforcement detection, Tr. 1771-72. DiChiara further testified that Abramo had Sovereign carry out a fraudulent initial public offering of common stock and warrants in a company called SC&T International ("SCTI"), Tr. 1743-45; paid brokers illegally high commissions (up to 35 percent) to motivate them to push SCTI stock, Tr. 1968-70; and manipulated SCTI's stock price by fabricating information, failing to deliver a prospectus, refusing to let customers sell the stock at any price, parking the stock, conducting unauthorized trades, and writing fake tickets for phony transactions, Tr. 1745-60, 1788.

To prove the existence of the multiple conspiracies described above, the government relied, inter alia, on the guilty pleas of co-conspirators, in the form of signed stipulations that stated the date of the guilty plea, the charge to which each co-conspirator pled, and the basic

relevant facts admitted in the allocution. In summary, the stipulations stated:

(a) On June 28, 1993, John Riggi, Virgil Alessi and Bartolomeo Nichola pled guilty to conspiring to participate in the affairs of a racketeering enterprise by plotting to murder Vastola. Tr. 2631-32.

(b) On May 22, 2001, Joseph Sclafani pled guilty to conspiring to participate in a racketeering enterprise by, inter alia: (i) conspiring to murder Frank D'Amato, and (ii) extorting Barr Industries, a construction contractor. Tr. 1436-37.

(c) On January 18, 2002, James Gallo pled guilty to conspiring to participate in a racketeering enterprise by, inter alia: (i) conspiring to murder Weiss, and (ii) conspiring to participate in loansharking. Tr. 2684.

(d) On March 14, 2003, Charles Stango pled guilty to conspiring to participate in a racketeering enterprise by conspiring to commit construction industry extortion. Tr. 1435.

(e) On April 21, 2003, Louis Consalvo pled guilty to conspiring to commit securities fraud and conspiring to murder LaRasso. Tr. 2011.

(f) On April 21, 2003, Gregory Rago pled guilty to conspiring to murder LaRasso. Tr. 2683.

After each allocution was read, the trial court gave a limiting instruction that the allocution could be considered only to establish that a particular racketeering enterprise or conspiracy existed, and that it could not be used to prove that any defendant on trial was a participant; as to

15

each defendant's participation, the jury must look to other evidence.  See Tr. 1437-38, 2012, 2632-33, 2685-86.  The court repeated and elaborated on this instruction during its final charge to the jury on the law (as set forth in the margin[1]).

_____

[1] In the final charge to the jury, the court stated in connection with the plea allocutions:

> You have also heard that others not called as witnesses pleaded guilty and made statements about their participation in certain crimes charged in the indictment.  You may consider these statements as evidence and like any other evidence in the case, give the statements such weight as you believe appropriate.  Please understand though, that you may consider those statements only on the following issues:  One, whether the racketeering enterprise charged in counts one and two existed; Two, whether any conspiracy or scheme to defraud referred to in the guilty plea you are considering existed; and, Three, what the role was of the person who pleaded guilty in that enterprise, that scheme or that conspiracy.  The question of whether any defendant on trial was a member of the enterprise, the racketeering conspiracy, the scheme to defraud, or any of the other conspiracies alleged in the indictment, and whether he participated in them, is an issue for which you will have to rely on other evidence.  There is [no] evidence in these statements naming any other defendant or coconspirator.  If you find based in part on these statements that [the] enterprise or the scheme to defraud or any of the conspiracies charged in the indictment existed, you must decide as a separate question whether the defendant you are considering was a part of each alleged conspiracy, based entirely on the other evidence in the case.  There is nothing in these statements that answers those questions one way or the other.

Tr. 3342-43.

16

**B. Verdicts.** Vitabile was convicted on Count One (racketeering) and Count Two (racketeering conspiracy), by virtue of the following predicate acts: (i) conspiracy to murder and murder of Louis LaRasso; (ii) conspiracy to murder and murder of John D'Amato; (iii) conspiracy to murder Thomas Salvata; (iv) conspiracy to murder Frank D'Amato; and (v) conspiracy to commit extortion in the construction injury. Vitabile was also convicted on Count Four, conspiracy to murder Thomas Salvata, 18 U.S.C. § 1959(a)(5); Count Five, conspiracy to murder Frank D'Amato, 18 U.S.C. § 1959(a)(5); and Count Nine, conspiracy to commit extortion in the construction industry, 18 U.S.C. §§ 1951 and 2. Vitabile was acquitted on Count Three, conspiracy to murder Frank Scarabino.

Abramo was convicted on Counts One and Two by virtue of the following predicate acts: (i) conspiracy to murder and murder of Frederick Weiss; (ii) conspiracy to murder and murder of Joseph Garofano; (iii) conspiracy to murder Daniel Annunziata and Corky Vastola; (iv) conspiracy to murder and murder of Louis LaRasso; (v) conspiracy to make and to collect extortionate extensions of credit; and (vi) conspiracy to commit securities fraud. Abramo was also

17

convicted on Counts Seven and Eight, conspiracy to make and to collect extortionate extensions of credit, 18 U.S.C. §§ 892, 894. He was acquitted on Count Six, which charged the financing of extortionate extensions of credit.

Schifilliti was convicted on Counts One and Two by virtue of the following predicate acts: (i) conspiracy to murder and murder of Louis LaRasso; (ii) conspiracy to murder Frank D'Amato; (iii) conspiracy to commit extortion in the construction industry; and (iv) conspiracy to make and to collect extortionate extensions of credit. Schifilliti was also convicted on Count Five, conspiracy to murder Frank D'Amato; Counts Seven and Eight, conspiracy to make and to collect extortionate extensions of credit; and Count Nine, conspiracy to commit extortion in the construction industry. Like Vitabile, Schifilliti was acquitted on Count Three, conspiracy to murder Frank Scarabino. Like Abramo, Schifilliti was acquitted on Count Six, financing extortionate extensions of credit.

The government thus failed to prove Counts Three and Six, as well as the predicate acts of conspiracy to murder Frank Scarabino and conspiracy to murder two unidentified John Does. For reasons discussed later, it is telling that none of the acquitted counts and unproven predicate acts was referred to in any of the eight plea allocutions.

18

Following the verdict, defendants moved for judgment of acquittal or a new trial, and later supplemented those motions to raise new grounds for overturning the convictions, including (among others) that it was error to admit the eight plea allocutions based on the intervening Supreme Court decision in Crawford v. Washington, 541 U.S. 36 (2004).  In March 2005, the district court ruled that the admission of the allocutions was harmless error as to all three defendants.  The defendants were sentenced principally to terms of life imprisonment.  Judgments were entered against Vitabile on July 12, 2006, against Abramo on June 9, 2006, and against Schifilliti on April 5, 2006.

**DISCUSSION**

**I.**

Crawford holds that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."  541 U.S. at 53-54.  It is thus constitutional error to admit as substantive evidence a plea allocution by a co-conspirator who does not testify at trial "unless the co-conspirator is unavailable and there has been a prior

19

opportunity for cross-examination."  United States v. McClain, 377 F.3d 219, 222 (2d Cir. 2004).  The government concedes that it was error to admit at defendants' trial the eight plea allocutions.  Although defense counsel objected to admission of the allocutions, they did not do so on Confrontation Clause grounds, and so our review is for plain error.[2]  For the reasons set forth below, we conclude that the admission of the allocutions was plain error, and we vacate the convictions.[3]

---

[2] Abramo argues that his trial counsel's single mention of cross-examination during a colloquy with the court about one of the eight pleas was sufficient to preserve the constitutional claim as to him.  However, the remainder of the colloquy makes clear that Abramo's counsel was arguing that the plea was not trustworthy, under our now-abrogated precedent that regularly approved the admission of an unavailable witness's plea allocution to prove the existence and scope of a conspiracy so long as accompanied by particularized guarantees of trustworthiness.  See Tr. 2006-08; see, e.g., United States v. Petrillo, 237 F.3d 119, 122-23 (2d Cir. 2000), abrogated by Crawford, 541 U.S. at 64.  The objection failed to "put [the] trial court on notice that Confrontation Clause concerns [were] implicated."  United States v. Dukagjini, 326 F.3d 45, 60 (2d Cir. 2003).

[3] "When the source of plain error is a supervening decision, we have employed a modified plain error standard" that shifts the burden to the government to prove that the error did not affect substantial rights.  United States v. Lombardozzi, 491 F.3d 61, 74 n.4 (2d Cir. 2007).  We need not resolve whether this standard runs contrary to Johnson v. United States, 520 U.S. 461 (1997), and whether it applies to unpreserved Crawford errors, because defendants here prevail under ordinary plain error review.  See United States v. Bruno, 383 F.3d 65, 79 n.8 (2d Cir. 2004).

20

Plain error is (1) error (2) that is plain, (3) that affects substantial rights, and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings. See Johnson v. United States, 520 U.S. 461, 467 (1997) (citing United States v. Olano, 507 U.S. 725, 732 (1993)). The admission of the eight allocutions here was "so egregious and obvious" an error (albeit in retrospect) that it clearly satisfies the first two conditions. United States v. Thomas, 274 F.3d 655, 667 (2d Cir. 2001) (en banc) (internal quotation marks omitted). The fourth condition is also satisfied: the error seriously affected the fairness and integrity of the proceedings because, as discussed in further detail below, the plea allocutions "almost certainly contributed to the jury's verdict." United States v. Hardwick, 523 F.3d 94, 99 (2d Cir. 2008); see also United States v. Bruno, 383 F.3d 65, 80 (2d Cir. 2004).

Our analysis comes down to the third prong of the plain error test: whether the error affected substantial rights. "An error affects a defendant's substantial rights if it is prejudicial and it affected the outcome of the district court proceedings." Thomas, 274 F.3d at 668 (internal quotation marks omitted). Here, the plea allocutions undoubtedly prejudiced the jury and influenced their verdicts.

21

**A. The Allocutions**

The plea allocutions were introduced to prove the existence of the following nine conspiracies:

(1) conspiracy to conduct the affairs of the Decavalcante organized crime family through a pattern of racketeering activity, charged against all three defendants (guilty pleas of James Gallo, Joseph Sclafani and Charles Stango);

(2) conspiracy to murder Louis LaRasso, charged against all three defendants (guilty pleas of Louis Consalvo and Gregory Rago);

(3) conspiracy to murder Gaetano Vastola, charged against Abramo (guilty pleas of Virgil Alessi, Bartolomeo Nichola and John Riggi);

(4) conspiracy to murder Weiss, charged against Abramo (Gallo's plea);

(5) conspiracy to murder John D'Amato, charged against Vitabile (Sclafani's plea);

(6) conspiracy to murder Frank D'Amato, charged against Vitabile and Schifilliti (Sclafani's plea);

(7) conspiracy to commit construction industry extortion, charged against Vitabile and Schifilliti (Sclafani's and Stango's pleas);

22

(8) conspiracy to participate in loansharking, charged against Abramo and Schifilliti (Gallo's plea); and

(9) conspiracy to commit securities fraud, charged against Abramo (Consalvo's plea).

The government conceded that it offered these pleas to corroborate the cooperating witnesses' testimony as to the existence of the charged conspiracies.  Tr. 2873.

**B.    Substantive Impact**

The consequences of the erroneous admission of the plea allocutions were manifold.

First, prejudice arose from the sheer number of plea allocutions admitted to prove the multiple conspiracies in this case.  See United States v. Becker, 502 F.3d 122, 131 (2d Cir. 2007) ("[T]he sheer number of plea allocutions admitted to prove the conspiracy in this case is significant, and highlights the importance of such testimony to the government's case.").  Eight separate plea allocutions, each confessing to participation in one or more conspiracies, were offered to the jury.  Their repetitive nature suggested that the conspiracy was so widespread that it would be plausible for the jury to assume that defendants were participants simply by their long and close association

with the attestants. See id. While the number of pleas alone would not suffice to establish a substantive impact on the outcome of the trial, their admission in this case cannot be described as merely cumulative. See, e.g., United States v. Reifler, 446 F.3d 65, 88 (2d Cir. 2006). The pleas described a wide and interlocking array of conspiracies that in the aggregate bolstered the government's depiction of defendants as the ringleaders of a vast criminal network.

Second, many of the conspiracies were overlapping such that evidence of one tended to support the existence of another. For example, the conspiracy to murder Frederick Weiss (evidenced by Gallo's plea) led to the conspiracies to murder family members Daniel Annunziata and Gaetano Vastola because of their refusal to assist in murdering Weiss (evidenced by the pleas of Allessi, Nichola, and Riggi). Similarly, the conspiracy to murder John D'Amato led to the conspiracy to murder his brother Frank D'Amato out of concern that he would exact revenge (both conspiracies evidenced by Sclafani's binary plea). Plea allocutions confirming the existence of one of the linked conspiracies naturally reinforced the evidence of the others, creating an echo chamber of implied guilt, and amplifying the prejudicial effect of the pleas.

Third, the detailed content of the plea allocutions corresponded to elements of the crimes charged against defendants, potentially bolstering the government's proof in those areas. See, e.g., Becker, 502 F.3d at 131 (finding prejudice where "the content of the plea allocutions was unusually far-reaching and detailed, and touched directly on issues that were central to [the] defense"). For example, in connection with his guilty plea of conspiracy to commit construction industry extortion, Stango admitted to "using the influence of the Decavalcante organized crime family, [and making] threats of labor unrest and threats of possible violence to obtain payments and jobs from construction companies." Tr. 1435. Similarly, Sclafani's allocution admitted to participating in the extortion of a company called Barr Industries "by use of threats." Tr. 1437. To establish extortion, the government was required to prove the use of "actual or threatened force, violence, or fear." 18 U.S.C. § 1951(b)(2); see United States v. Zhou, 428 F.3d 361, 371 (2d Cir. 2005). In defending against these extortion charges, Vitabile and Schifilliti attempted to show that the unions' dealings with contractors conformed to common, legitimate business practices. See, e.g., Tr. 729-30. The Stango and Sclafani pleas undermined this defense

25

by suggesting that Decavalcante family members used threats and violence routinely.

Other allocutions similarly contained detailed information that invited the jury to make improper assumptions regarding defendants' roles in the crimes charged.[4]  See, e.g., Becker, 502 F.3d at 133.

### C.   Limiting Instructions

The government argues that the district court's limiting instructions inoculated against the error.  While

---

[4] Examples include:  Consalvo and Rago both admitted to participating in the conspiracy to murder LaRasso, and their allocutions provided details regarding the motive, timing and method for carrying out the conspiracy's object.  The defense against this charge focused on inconsistencies in the cooperating witnesses' testimony as to whether the agreement to murder LaRasso was aborted, and which of several plans would be used in carrying out the hit.  Thus, it was significant that the plea allocutions confirmed an agreement to murder LaRasso and the use of a gun in the course of it.  Cf. Reifler, 446 F.3d at 90 (admission of plea allocutions was harmless error where, inter alia, they did not "indicate the methods" used by defendants).

Consalvo also admitted a conspiracy to commit securities fraud between January 1993 and March 1999, which was executed by making false statements in connection with a particular stock.  The dates and fraud description in Consalvo's allocution correspond precisely with those in the indictment charging Abramo with similar offenses as to the same stock.  As Abramo's defense centered on lack of knowledge of fraud, Consalvo's plea would have significantly prejudiced this defense by suggesting that other members of Abramo's crew had the necessary mental culpability for the offense.  See, e.g., Hardwick, 523 F.3d at 99.

26

we ordinarily "presume that juries follow limiting instructions," Id., 502 F.3d at 130, it is inappropriate to do so "where the prejudicial spillover was so overwhelming, they cannot be presumed to be effective," United States v. McDermott, 245 F.3d 133, 140 (2d Cir. 2001).  Under the particular circumstances of the trial in this case, there was an "overwhelming probability that the jury [was] unable to follow the court's instructions."  United States v. Jones, 16 F.3d 487, 493 (2d Cir. 1994).

The prejudicial spillover of the plea allocutions is manifest in the alignment of the verdicts.  The jury convicted on every substantive count supported by a plea allocution; and where no plea allocution was offered in support of a substantive count, the jury acquitted.  Thus, Vitabile and Schifilliti were acquitted of the conspiracy to murder Frank Scarabino, and Abramo and Schifilliti were acquitted of financing extortionate extensions of credit.

The same general pattern held for the predicate acts, with but two exceptions: no plea allocution was offered in support of the conspiracy to murder Garofano and the conspiracy to murder Salvata--yet, the jury found them proven.  These exceptions, however, prove the rule, as they involve predicate acts charged within the overarching

27

racketeering conspiracy corroborated by six plea allocutions. In addition, both of these proven predicate acts were offshoots of other conspiracies corroborated by Gallo's plea allocation. The Garofano murder conspiracy was an offshoot of the Weiss murder conspiracy, and the Salvata murder conspiracy was an offshoot of the loansharking conspiracy. The correlation between the verdicts and the plea allocutions strongly suggests that the jury was improperly influenced by the inadmissible evidence. Cf. Reifler, 446 F.3d at 90 (noting that the "discerning nature of the verdicts," which acquitted some defendants and convicted others, "strongly indicate that the plea allocutions [which did not distinguish among the defendants] played no role in the convictions").

**D.    Strength of Government's Case**

The government alternatively argues that because the evidence of guilt was otherwise so overwhelming, the error was harmless. "The erroneous admission of evidence is not harmless unless the appellate court can conclude with fair assurance that the evidence did not substantially influence the jury." United States v. Jean-Baptiste, 166 F.3d 102, 108 (2d Cir. 1999). "In making this determination, we

28

consider principally whether the government's case against the defendant[s] was strong; whether the evidence in question bears on an issue that is plainly critical to the jury's decision . . . ; whether the evidence was emphasized in the government's presentation of its case and in its arguments to the jury; and whether the case was close." Id. at 108-09 (internal quotation marks and citations omitted).

Most of these factors favor defendants. The government's case consisted primarily of cooperating witness testimony, which, even viewed in the light most favorable to the government, contained inconsistencies and contradictions. The government anticipated the jury's reluctance to rely solely on such testimony, promising in its opening statement that "everything these witnesses tell you will be corroborated by other evidence." Tr. 24. As the government concedes, this corroboration included the eight allocutions which "were offered as proof of the . . . nine conspiracies" alleged in the indictment. Appellee's Br. 72.

Although the government also offered physical evidence, including photographs and video and audio tapes, as corroboration, the government betrayed anxiety about the persuasiveness of some of this evidence. Thus, the

29

government's opening "stress[ed]" to the jury that "[t]here is no smoking gun on those [audio] tapes as to these three defendants" because the cooperating witness who wore the wire was "a low-level associate" who "simply was not in a position to record these high-ranking members of the family." Tr. 41. In this context, the jury could be expected to give even greater weight to the plea allocutions.

This prejudicial impact was reinforced by the government's repeated references to the plea allocutions in summation, attributing to them undue probative value and significance. See Wray v. Johnson, 202 F.3d 515, 526 (2d Cir. 2000) ("[W]here the prosecution has emphasized the wrongly admitted evidence, it may well have been important in the minds of the jurors."). In its main and rebuttal summations combined, the government referred to the allocutions eight times.

First, in providing an overview of the evidence, the government reminded the jury that it "heard numerous stipulations about guilty pleas that members and associates of the Decavalcante family have entered in federal court," and urged the jury to "consider these guilty pleas as evidence that certain of the conspiracies charged in this

30

indictment existed." Tr. 2873. The government then recited details from four of those guilty pleas. Id.

Second, after reviewing the testimony of three cooperating witnesses regarding the conspiracy to murder Annunziata and Vastola, the government stated that this testimony is corroborated by three plea allocutions:

> [T]he testimony of all the cooperators regarding the existence of the conspiracy to kill Corky Vastola was <u>corroborated by the guilty plea stipulations</u> that were read to you. As you heard, the boss of the family, John Riggi, Virgil Alessi and Barry Nichola all pleaded guilty to their roles in that conspiracy to murder Corky Vastola.

Tr. 2899 (emphasis added). In short, the government was asking the jury to rely on the plea allocutions to add weight to the cooperating witnesses' testimony about Abramo's participation in the Vastola murder conspiracy.

Third, the government reviewed the evidence against all three defendants concerning the murder of Louis LaRasso, including testimony about the participation of Louis Consalvo and Gregory Rago, who were members of Abramo's crew. The government urged the jury to conclude "[t]his conspiracy existed" based in part on two plea allocutions: "One way you know that this conspiracy to kill Louis LaRasso existed was that, as you heard, Consalvo and Rago pleaded

31

guilty earlier . . . this year to their roles in this indicted conspiracy." Tr. 2901. Implicit in this argument was that Consalvo's and Rago's plea allocutions corroborated the cooperating witnesses' testimony about participation in that conspiracy by defendants.

Fourth, in arguing that "Philip Abramo and his coconspirators engaged in manipulation of the price of SCTI stock and otherwise engaged in securities fraud at Sovereign," the government cited the testimony of cooperating witness DiChiara. Tr. 2930. The government then emphasized that DiChiara's testimony was corroborated by a plea allocution:

> [O]ne of the ways you know that DiChiara
> did not make up his testimony about the
> conspiracy to manipulate the price of
> SCTI's stock at Sovereign, is that
> Abramo's own brother-in-law, Louis
> Consalvo, pleaded guilty to committing
> securities fraud by making false
> statements about SCTI's stock. That is
> proof of the conspiracy.

Id. (emphasis added). The gist of this argument is that DiChiara is telling the truth about the securities fraud charge because Consalvo pled guilty to the same charge. This reinforced DiChiara's extensive testimony on the subject against Abramo.

Fifth, after defense counsel argued that the evidence proved no more than that the cooperating witnesses

32

themselves were murderers (and not that defendants joined any murder conspiracy), the government in rebuttal again relied on plea allocutions.  The government reminded the jury that it "heard [guilty] pleas to murder conspiracies from people from Phil Abramo's own crew, from Joey Sclafani, from Jimmy Gallo," and argued that those pleas established that the cooperating witnesses "were [not] the only violent guys in the Decavalcante family."  Tr. 3205.

Sixth, to counter defense arguments that talk about killing certain victims was just "joking" or "rumors," the government pointed to plea agreements that admitted participation in murder conspiracies.  Specifically, in rebutting the defense claim that Sclafani was just joking about killing Frank D'Amato, the government exclaimed, "Joking?  He pled guilty to it.  Government Exhibit 58, you heard the stipulation, he pled guilty to it."  Tr. 3206. The government continued in this vein:

> The broader point is this, Victor DiChiara is not telling you about rumors. He is not repeating some kind of game of telephone about conversations that people had.  He's telling you about conversations he had with people who conspired with him to murder Frank D'Amato.  One of the murder conspiracies to which people pled guilty, including the cooperators.  And the idea that Vitabile got charged with this because of a misunderstood joke that got blown out of proportion is ridiculous. . . . [Y]ou

33

then heard that Sclafani, among other people, <u>pled guilty to conspiring</u> to kill the guy.

Tr. 3207 (emphasis added). The government was plainly asking the jury to infer that Sclafani's plea proves that DiChiara is telling the truth about the murder conspiracies and defendants' participation in them.

Seventh, as previously mentioned, the government anticipated the jury's reluctance to rely on the audio tape recordings because they did not provide a "smoking gun" as to these defendants. <u>See, e.g.</u>, Tr. 3240 ("Now, there's no tape of these guys ordering murders."). In rebutting defense arguments that the audio tapes failed to connect defendants to extortion in the construction industry, the government reprised testimony of cooperating witnesses on that score, in particular Palermo's testimony that he regularly delivered to Schifilliti cash payments from cement companies. Tr. 3238. The government then reminded the jury that the testimony and tapes were corroborated by Stango's plea allocution:

The evidence of that is clear, but I really bring it up because I want to discuss something real quickly. Which I don't think we mentioned earlier on this conspiracy, conspiracy to extort companies using unions etc., one of the reasons you know that conspiracy exists is because . . . Charlie Stango you may remember you heard <u>pled guilty</u> to a

34

conspiracy, so you know the conspiracy existed.

Tr. 3239 (emphasis added). The jury plausibly could conclude from this argument that they were entitled to rely on Stango's plea to corroborate Palermo's testimony about construction industry extortion, and in particular Schifilliti's role in the scheme.

Finally, the government's last words to the jury were (again) to consider the plea allocutions as evidence of the crimes charged against defendants, and not merely of evidence of the existence of the conspiracies. The government asked the jury to consider all of the proof of "the murder of those four men and . . . the other crimes as well," including:

> the corroboration from the tapes, the conversation of these defendants on tape with Vinnie Palermo, . . . photographs and videotapes[] in meetings with high-ranking Gambino family members and others, . . . that numerous people have pled guilty to conspiracy to murder and extort as charged here, . . . [and] the consistent testimony of the corroborating witnesses . . . .

Tr. 3251-52 (emphasis added).

The plea allocutions were woven throughout the summation, and went beyond isolated, casual or merely cumulative mention. Cf. United States v. Lombardozzi, 491 F.3d 61, 77 (2d Cir. 2007) (single mention, in fifty-page

35

summation, of erroneously admitted allocution was harmless); Reifler, 446 F.3d at 88 (one paragraph discussing allocution in 110-page summation was harmless).  Nor did the government attempt to mitigate any prejudice or reinforce the limited purpose of the evidence by reminding the jury of the court's instructions.  Rather, the import that the government repeatedly assigned to the plea allocutions effectively eroded the court's limiting instruction and exacerbated the prejudicial effect.  See Becker, 502 F.3d at 132.  Given the number and content of the plea allocutions, and the corroborative value and repeated emphasis placed on them, the constitutional error was not harmless.

We conclude that all four conditions for plain error are satisfied here, and we exercise our discretion to notice the error and vacate the judgments of conviction.


**II.**

Schifilliti argues that the evidence was insufficient to convict him of the LaRasso murder and the loansharking conspiracy; and Abramo argues that the evidence was insufficient to convict him of the loansharking conspiracy and the securities fraud conspiracy.

Defendants undertake a heavy burden in seeking to reverse their convictions on grounds that the evidence was insufficient.  See United States v. Dhinsa, 243 F.3d 635, 648 (2d Cir. 2001).  A conviction will be affirmed if, viewing all the evidence in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  The sufficiency test is applied "to the totality of the government's case and not to each element, as each fact may gain color from others."  United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999).  All issues of credibility, including the credibility of a cooperating witness, must be resolved in favor of the jury's verdict.  See United States v. Glenn, 312 F.3d 58, 64 (2d Cir. 2002).  "In situations where some government evidence was erroneously admitted, we must make our determination concerning sufficiency taking into consideration even the improperly admitted evidence."  United States v. Cruz, 363 F.3d 187, 197 (2d Cir. 2004) (citing Lockhart v. Nelson, 488 U.S. 33, 39-40 (1988)).

Although we are vacating the convictions on Crawford grounds, we must reach the sufficiency challenges because if the evidence was insufficient, double jeopardy would bar

37

retrial.  See United States v. Marcus, --- F.3d ---, --- n.6, No. 07-4005-cr, 2008 WL 3474434, at *7 n.6 (2d Cir. Aug. 14, 2008); see also United States v. Bruno, 383 F.3d 65, 90 n.20 (2d Cir. 2004) (observing that where evidence is insufficient excluding the improperly admitted evidence, but is sufficient including the improperly admitted evidence, the remedy is retrial rather than acquittal).  We conclude that the totality of the evidence that was presented at trial would be legally sufficient to satisfy the elements of the convictions if all of that evidence had been properly admitted.

**A.  LaRasso Murder**

Schifilliti was convicted of both the conspiracy to murder and the actual murder of Louis LaRasso.  Schifilliti argues that the evidence was insufficient to convict him of the actual murder because LaRasso's body was never found and the only evidence that Schifilliti was present at the murder scene is highly attenuated.

First, there was evidence that LaRasso was killed and did not just go underground: cooperating witnesses testified about a Decavalcante administration meeting at which LaRasso's death was ordered by all three defendants and the

other members of the ruling panel, Tr. 1069-74; Capo testified that he discussed the plans and logistics of the hit with Schifilliti, Tr. 327-28; Rotondo testified that other co-conspirators reported that Schifilliti was present (and was nauseated) at the murder scene, Tr. 1079-82; LaRasso's family said he disappeared on November 11, 1991, Tr. 2669-71; cooperating witnesses testified that at around the same time they were told by Abramo and others that Abramo and Schifilliti had "taken care" of LaRasso, Tr. 338; and LaRasso's abandoned car was found at an airport--as envisioned in the murder plan, Tr. 2672-73.  It was entirely reasonable for the jury to conclude that LaRasso was murdered.

Schifilliti was placed at the scene of the murder by Rotondo's testimony as to what another co-conspirator had witnessed--attenuated evidence, as Schifilliti characterizes it.  But, in any event, it was unnecessary to prove Schifilliti's presence at the murder scene in order to convict him of the murder.  The evidence established that Schifilliti was one of the administration members who "ordered" the hit; that order was a predicate for the murder.  Commanding or procuring a criminal act is sufficient to impose criminal liability as a principal under

39

both 18 U.S.C. § 2 (whoever "aids, abets, counsels, commands, induces or procures [the commission of an offense] is punishable as a principal"), and under N.Y. Penal Law § 20.00 (an aider and abettor is criminally liable as a principal whenever he "solicits, requests, commands, importunes, or intentionally aids such person to engage in" criminal conduct with the requisite mens rea). The totality of evidence is sufficient to support a jury finding that Schifilliti commanded the murder, and that LaRasso was murdered pursuant to that command.

**B.    Loansharking Conspiracy**

Abramo and Schifilliti argue that the evidence was insufficient to convict them of conspiring to make and collect extortionate extensions of credit. In particular, they contend that there was no evidence of any particular extortionate loan, or of extortionate means used to collect such a loan, or of a conspiracy between these two defendants to commit the offense. The existence of the loansharking conspiracy rested in large part on Gallo's improperly admitted plea allocution, and on co-conspirators' statements reported by the cooperating witnesses, some of which defendants argue were also inadmissible. But for the

40

purpose of assessing the legal sufficiency of the evidence to support a criminal conviction, we must weigh that evidence as though it was properly admitted. See Cruz, 363 F.3d at 197. (Our ruling on sufficiency therefore does not support any inference as to admissibility.)

Cooperating witnesses admitted to personal participation in "loansharking," and testified extensively about the Decavalcante family's involvement in "loansharking" and "shylocking." See, e.g., Tr. 156-57, 1275, 1590, 1932. It was explained that "shylocking is the same thing as loan sharking." Tr. 2565. Cooperating witness Palermo defined loansharking as lending money at high interest rates, and using violence or the threat of violence to ensure repayment. Tr. 1976-77. Asked what happens "if a loan shark customer fails to pay back the money he borrowed," Palermo explained, "you extend it for a while and then if nothing happens, he winds up with a beating." Tr. 1977. Palermo described a particular debtor who was "having difficulty keeping up with his payments," and was consequently "afraid for his life" and "thought the wise guys to whom he owed the money were going to hurt or kill him." Id. Similarly, Rotondo defined loansharking as "len[ding] money to others at usurious rates . . . with the

41

understanding that something would happen to them if they didn't pay it back." Tr. 930. Capo testified that the means of collecting such loans were "[t]hreats of intimidation, reputation, I would try to know my customers to make sure they . . . understood my position in organized crime or association with it." Tr. 158. See 18 U.S.C. § 891(7) (defining "loansharking" to include an extension of credit where "the debtor reasonably believed that . . . the creditor had a reputation for the use of extortionate means to collect . . . or to punish the nonrepayment thereof").

Specifically as to Abramo, cooperating witnesses testified that he was the "Shylock's Shylock," Tr. 1145, and offered details about Abramo's "loan shark book" and "loan shark pickups," Tr. 1146, 1147. They described Abramo's partners in the loanshark business, the crew members who served as enforcers, his arrangements for delivery of loanshark payments, and his measures for dealing with problem debtors. Tr. 1145-47, 2237, 2251-52. As to Schifilliti, cooperating witness Palermo testified that the defendant discussed details about his loansharking business and on one occasion asked Palermo to lend two crew members to make a collection on a loan. Tr. 2282, 2037. Palermo further testified about a conversation with one of those

42

crew members who explained that, in order to collect money from the debtor, he had to "strong-arm[] the guy, [get] very nasty with the guy." Tr. 2222-23.

The evidence thus established that these defendants engaged in loansharking and conspired with several other co-conspirators to run their loansharking operations. It was unnecessary to link Abramo's and Schifilliti's operations in order to convict them both of the loansharking offense. The combination of the admissible and inadmissible evidence was sufficient to support a conviction.

## C.    Conspiracy to Commit Securities Fraud

Abramo argues that the securities fraud conviction cannot stand because it was based almost entirely on the uncorroborated testimony of cooperating witness DiChiara. However, "a conviction may be supported only by the uncorroborated testimony of a single accomplice . . . if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt. Any lack of corroboration goes merely to the weight of the evidence, not to its sufficiency." United States v. Parker, 903 F.2d 91, 97 (2d Cir. 1990) (internal citation omitted)). DiChiara testified, based on daily face-to-face interaction

with Abramo and with other co-conspirators in the stock fraud, that: Sovereign was not a legitimate brokerage; Abramo controlled Sovereign and was actively involved in its fraudulent activities and in measures to avoid law enforcement detection; and the stock offering for the company known as SCTI was a scam designed and implemented by Abramo. The jury was entitled to believe DiChiara.

In any event, other cooperating witness testimony corroborated DiChiara's description of Abramo's securities fraud schemes. Capo, the captain to whom DiChiara reported, testified that Abramo told him directly that Sovereign was "his," but that he kept his office separate for legal reasons. Tr. 345. Capo also testified that DiChiara had "put it on record" with Capo that DiChiara was working with Abramo at Sovereign, which Capo reported up the Decavalcante family chain of command. Tr. 351. Capo recalled DiChiara's descriptions of his activities at Sovereign, including "sell[ing] bogus stocks, fake stocks." Tr. 348.

Palermo testified about conversations with one of Abramo's partners in the SCTI fraud who explained how money realized from the stock fraud had to be hidden. Tr. 2248. Abramo confirmed to Palermo that DiChiara was working for him at Sovereign, and bragged to Palermo about the success of Sovereign's "pump and dump" schemes. Tr. 2238-43. Other

44

Abramo crew members, including Louis Consalvo, told Palermo about their roles in enforcing Abramo's control over the brokers at Sovereign, including in one case hitting an employee over the head with a telephone. Tr. 2243. Rotondo described Abramo as "the original pump and dump guy on Wall Street." Tr. 1148.

Abramo argues in the alternative that the government failed to adduce sufficient evidence of a nexus with interstate commerce, the jurisdictional element of the offense. As this Court has previously observed, it is easy for prosecutors to overlook this simple but essential element of a federal offense:

> [F]ederal prosecutors must devote the minimal effort necessary to establish federal jurisdiction over the acts of the accused. There is nothing more crucial, yet so strikingly obvious, as the need to prove the jurisdictional element of a crime. Sadly, we are forced to continue reversing convictions, as long as prosecutors remain lax in the simpler aspects of their jobs.

United States v. Leslie, 103 F.3d 1093, 1103 (2d Cir. 1997).

Abramo characterizes the evidence relating to Sovereign's activities as having been cabined within its Wall Street offices, and points out (for example) that no evidence was adduced of any telephone calls made or mail sent out-of-state from that office. Abramo accuses the

45

government of relying, for its interstate nexus, solely on the supposition that of the 100 to 150 Sovereign brokers, one or another must surely have called one or more customers outside New York State.

The government's evidence here is thin but sufficient. It was able to show an interstate nexus from the following evidence in the trial record: (a) Sovereign used, in connection with the SCTI scam, foreign nominee accounts held in offshore companies controlled by Abramo and his co-conspirators; (b) an Abramo partner who played a major role in the SCTI scheme was stationed in Sovereign's office in Boca Raton, Florida; (c) trading information about SCTI was accessible electronically from other states (and, in fact, a defense expert testified about accessing the information from New Jersey); and (d) the SCTI scheme was national in scope, making it reasonable to infer that its implementation necessitated the use of interstate or international mail and wire facilities.

Because trial error otherwise requires vacatur of the convictions, we express no opinion as to whether the evidence of the LaRasso murder, loansharking and securities fraud charges would be sufficient without the improperly admitted evidence. Cf., United States v. Hardwick, 523 F.3d

94, 102 & n.7 (2d Cir. 2008). In assessing the sufficiency of evidence, we have not used the word "ample." Nor do we reach defendants' remaining arguments challenging (i) the admission of co-conspirators' statements; (ii) the government's failure to disclose certain Brady materials; and (iii) the life sentence of one of the defendants.

## CONCLUSION

For the foregoing reasons, the judgments of the district court are vacated and remanded for further proceedings consistent with this opinion.